2007 OK CR 29

**Scott James EIZEMBER, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2005–319.**

Court of Criminal Appeals of Oklahoma.

July 26, 2007.

As Corrected Aug. 10, 2007.

Craig D. Corgan, Charles T. Laughlin, Janet Chesley, Oklahoma Indigent Defense System, Norman, OK, counsel for appellant at trial.

Max Cook, District Attorney, Mike Loeffler, Pamela Hammers, Assistant District Attorneys, Sapulpa, OK, counsel for the State at trial.

Lee Ann Jones Peters, Jamie D. Pybas, Oklahoma Indigent Defense System, Norman, OK, counsel for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Seth S. Branham, Assistant Attorney General, Oklahoma City, OK, counsel for the State on appeal.

## *OPINION*

LUMPKIN, P.J.

¶ 1 Appellant Scott James Eizember was tried by jury and convicted of Second Degree Felony Murder (Count I) (21 O.S.2001, § 701.8(2)); First Degree Malice Murder (Count II) (21 O.S.2001, § 701.7(A)); Assault and Battery with a Dangerous Weapon (Count III) (21 O.S.2001, § 645); Shooting with Intent to Kill (Count IV) (21 O.S. 2001, § 652); First Degree Burglary (Count V) (21 O.S.2001, § 1431); and Second Degree Burglary (Count VI) (21 O.S.2001, § 1435), Case No. CF–2000–35, in the District Court of Canadian County.[1] In Count I, the jury recommended a prison sentence of one hundred fifty (150) years. In Count II, the jury found the existence of two aggravating circumstances and recommended the punishment of death. In Count III, the jury recommended a sentence of ten (10) years imprisonment and a ten thousand dollar ($10,000.00) fine. In Count IV, the jury recommended life imprisonment and a ten thousand dollar ($10,000.00) fine. In Count V, the jury recommended twenty (20) years imprisonment and ten thousand dollar ($10,-000.00) fine.[2] The trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal.[3]

¶ 2 The State's evidence showed that on a late September afternoon in 2002, Appellant rode into Depew, Oklahoma. Literally. Riding a bicycle, Appellant stopped at the edge of a flower bed in front of the Methodist Church. There he met John Wright who was mowing the church lawn. Appellant told Mr. Wright he was riding his bicycle cross country from Detroit, Michigan, to San Diego, California, to raise money for victims of the September 11th terrorist attacks. Appellant asked Mr. Wright if he could pitch a tent and sleep overnight on the church lawn. Mr. Wright offered to let Appellant spend the night in the air-conditioned fellowship hall inside the church. Appellant took Mr. Wright up on his offer, and even attended church services the following morning. Thus began a friendship between the two men. Mr. Wright introduced Appellant to church members, his neighbors, A.J. and Patsy Cantrell, and his family, Carla, his wife, and his daughter and son-in-law, Kathy and Mark Biggs.

¶ 3 Mark Biggs had a machine he used in his boot and western wear store which was not working properly. Appellant said he had been an engineer at the Ford Motor Company and he could fix the machine. Mr. Wright took Appellant to the Biggs' home and Appellant worked on the machine. Appellant spent that night at the Biggs' home. A couple of days later, Appellant told the Wrights and the Biggs he needed to go to Edmond, Oklahoma. They advised Appellant it would not be safe to ride his bicycle, and agreed to drive him there.

---

1. Appellant was originally charged in Count I with First Degree Malice Aforethought Murder. The charges against Appellant were originally filed in the District Court of Creek County, Bristow Division, Case No. BCF–03–260. The case was later transferred upon Appellant's motion for a change of venue to the District Court of Canadian County, approximately 100 miles away from Bristow.

2. In Count VI, the jury recommended seven years (7) imprisonment and a ten thousand dollar ($10,000.00) fine. However, at sentencing, the trial court dismissed Count VI finding it merged as a matter of law with Count I.

3. Appellant's Petition in Error was filed in this Court on September 2, 2005. Appellant's brief was filed April 19, 2006. The State's brief was filed August 21, 2006. The case was submitted to the Court August 22, 2006. Appellant's reply brief was filed September 11, 2006. Oral argument was held April 17, 2007.

¶ 4 The Wrights and Biggs did not hear from Appellant again until close to Thanksgiving when they learned he was arriving at the Tulsa bus station. At Mrs. Wright's request, Mark Biggs picked up Appellant at the bus station and drove him back to Depew. Appellant told Biggs his wife and two young children had died in a car crash, that he did not have any place to live, and did not need to be back in Detroit anytime soon. Appellant shared Thanksgiving dinner with the Wrights and Biggs and stayed at the Biggs' home.

¶ 5 During this time, Appellant and Kathy Biggs developed a romantic relationship. On December 13, Appellant told Mark Biggs he and Kathy were in love. Appellant said he was getting a court settlement from a trucking company for over one million dollars and he wanted Mark Biggs to move out. Biggs moved out that day.

¶ 6 Mark and Kathy subsequently divorced. Appellant and Kathy lived together until the summer of 2003 when their relationship soured. At that time, Appellant and Kathy shared an apartment in Tulsa. In July, Kathy worked as a registered nurse in Lawton, working six days on and six days off. When she was not working, she returned to the Tulsa apartment. However, by August 2003, she told Appellant to leave the apartment, had the utilities turned off, obtained a protective order against Appellant, and moved back to her parents' home in Depew. In September, she realized she had forgotten to contact the cable company. When she finally did, she learned that someone had been in the apartment watching the cable channels the past 24 to 36 hours. Sure that Appellant had broken into the apartment, Kathy immediately phoned the Tulsa Police Department. Appellant was inside the apartment when the police arrived. He was arrested for burglarizing the apartment and incarcerated in the county jail. While awaiting disposition of the charges, he told a cellmate that his girlfriend was a "pharmaceutical rep", she was dealing drugs and that he was going to "get even" with her. Appellant was released from custody in October 2003.

¶ 7 On October 18, 2003, Appellant broke into the home of A.J. and Patsy Cantrell.

The elderly couple lived across the street from the Wrights. Once inside, Appellant found a .410 shotgun that he loaded with shells from the residence. Patsy Cantrell was soon dead from a gunshot to the back and A.J. Cantrell was dead from multiple blunt force traumas to the head. Their bodies were later found on the bathroom floor, with Patsy's body lying on top of her husband. Their Chihuahua dog was found cowering in the bathroom near the bodies.

¶ 8 After killing the Cantrells, Appellant walked across the street to the Wright residence. He jerked open the front door and found 16 year old Tyler Montgomery, Kathy Biggs' son, seated in a recliner watching television. Montgomery saw Appellant come through the door carrying a shotgun with an "angry look on his face." Montgomery knew Appellant was not welcomed in the Wrights' home. He immediately jumped up and ran towards the kitchen where his grandmother, Carla Wright, was baking cakes for her Sunday school class. Before Montgomery could get to the kitchen though he was struck in the lower back with shot from the shotgun. The force of the shotgun blast pushed Montgomery to the ground. Appellant stepped over Montgomery's body and entered the kitchen. There he proceeded to beat Carla Wright with the end of the shotgun, inflicting at least four severe blows to her head.

¶ 9 While Appellant was beating his grandmother, Montgomery was able to get up, although with great difficulty, and run to the back of the house looking for a weapon. Unbeknownst to Montgomery, the guns had been moved to another part of the house. Unable to find a weapon, Montgomery ran out the back door and jumped into his pickup. The armed Appellant saw this and followed him outside. Upon seeing Appellant, Montgomery locked the doors to the pickup and backed out of the driveway. Appellant jumped into the bed of the pickup and reloaded the shotgun. Montgomery drove erratically trying to throw Appellant out of the pickup. Appellant not only remained in the pickup, but fired at Montgomery through the back windshield of the pickup. The shot hit Montgomery in the shoulder.

¶ 10 After being shot, Montgomery drove the truck through several ditches before purposely crashing the truck into large metal pole at the entrance to the Depew Sports Complex. He knew he could get help there as his grandfather was announcing the local football game. After the crash, Montgomery jumped out of the truck and ran for help. As a crowd gathered around the bloodied Montgomery, Appellant jumped out of the back of pickup and began walking in the opposite direction. He was still carrying the shotgun.

¶ 11 John Inman was driving down the street when he saw the bloodied Appellant. He had never met Appellant before, but heard the crash of the pickup and went to investigate. Inman told his girlfriend to get out of the car that he was going to offer Appellant a ride. Appellant accepted Inman's offer. Inman noticed when Appellant got into the car that the hammer on the shotgun was cocked. Appellant told Inman he was going to the Wrights' residence. Inman told Appellant he should go to the hospital due to the large gash on his forehead, which was bleeding profusely. Appellant agreed, but said he needed to get some personal items from home first.

¶ 12 At Appellant's direction, Inman drove Appellant approximately seven miles east to Airport Road near Bristow. Finding himself on a country road, with the next road nearly three miles away, Inman became suspicious of Appellant and his intentions. Inman told Appellant to unload the shotgun. When Appellant refused, Inman repeated his demand. Appellant looked at the shotgun, opened the passenger door and began to slide out. As he did, he raised the barrel of the shotgun. Believing he was about to be shot, Inman grabbed the barrel of the shotgun and pushed it away from his head. Appellant fired and the shot barely missed Inman's hand and head. Inman threw his car into drive and sped off. In the rear view mirror, he saw Appellant running after him, reloading the gun. Inman drove straight to the police department.

¶ 13 In the meantime, Carla Wright had managed to recover just enough from her beating to look for help. Barely able to see due to the blood dripping down her face, she walked across the street to the Cantrells' home. Despite talking to Pasty Cantrell earlier that day, Mrs. Wright received no response to her repeated knocks at the front door. So she opened the door and went inside. She walked through several rooms calling for the Cantrells. She walked past the bathroom and saw what turned out to be Pasty Cantrells' legs. However, at the time, through her blurred and bloodied vision, Mrs. Wright thought she saw a scarecrow, because her grandchildren had been stuffing scarecrows earlier in the day. Believing she had not found the Cantrells at home, Mrs. Wright left the house and found help from a passerby.

¶ 14 For the next eleven days, Appellant evaded capture despite a massive police search, largely by hiding in the rural wooded areas between Depew and Bristow. During this time, the home of Rodney Lewis, located near Airport Road, was burglarized. Clothes, including a pair of jeans and a shirt, food and a .380 handgun were taken. The handgun was not operational, as Mr. Lewis had lost the firing pin. Left behind was a bloody shirt and a pair of bloody jeans.

¶ 15 On November 23, 2003, seventy-five year old Doyce Pitre, a volunteer at the Depew Methodist Church food pantry, accidentally discovered Appellant hiding inside the building. Upon seeing the gun-wielding Appellant, Ms. Pitre ran screaming from the building. She left her keys hanging in the front door to the building. Appellant grabbed the keys and used them to steal Ms. Pitre's car.

¶ 16 That same day, Dr. Sam Peebles and his wife Suzanne, left Ft. Smith Arkansas, for their home in Nashville, Arkansas. Nearing the town of Waldron, Arkansas, they noticed a red Toyota on the side of the road. A man, Appellant, was standing beside the car shivering. The Peebles stopped and asked Appellant if he needed help. Appellant said he thought there was something wrong with his car because he had just filled up with gas. Appellant accepted the Peebles' offer to take him to a nearby convenience store to get help. Appellant told the Peebles his girlfriend had been in a wedding and he was on his way to Texarkana to pick

her up. Appellant took a seat in the Peebles' van, directly behind Dr. Peebles, who was driving. After only a few minutes, Appellant pulled out a gun, pointed it at Dr. Peebles, and said they were going to drive for a while. For approximately the next six hours, the Peebles drove, through Arkansas and Texas, following Appellant's directions. He asked them a couple of times if they had been to Mexico and if they knew how to get there. On several occasions, Appellant told the Peebles that he was taking the safety off the gun and if they did what he said, they would have something to tell their grandkids, but if they didn't, "I'm already facing death row in Oklahoma."

¶ 17 The gun in Appellant's possession was the .380 semi-automatic pistol he had taken in the burglary of the Lewis home. Unbeknownst to him, it didn't work. When Appellant first drew the gun on the Peebles, Mrs. Peebles tried to grab it away from Appellant. During the ensuing struggle, Appellant yelled that he was going to kill Dr. Peebles if she did not let go. He said, "that old man did the same thing and I killed his wife." Believing the gun had been used to previously kill someone, Mrs. Peebles let go.

¶ 18 After a while, the Peebles became convinced Appellant was going to kill them. During a roadside restroom break, Dr. Peebles drew his own handgun, a nine shot revolver, and shot Appellant multiple times. Despite being shot, Appellant wrestled with Dr. Peebles and took the revolver away. Appellant struck Dr. Peebles' in the head repeatedly with the .380 pistol. While Dr. Peebles was on the ground, Appellant kicked him in the head. When Mrs. Peebles attempted to help her husband, Appellant turned the gun on her. He said he wasn't going to kill her husband, he was going to kill her and he put the .380 pistol to her head. He cocked it and pulled the trigger, but the gun didn't fire. Appellant then hit her in the head with the gun and ran off. He drove off in the Peebles' van, leaving them injured on the side of the road. He went to a convenience store where a store clerk phoned the police. Appellant was subsequently taken to the hospital in Lufkin, Texas and later arrested by Texas authorities.

¶ 19 After being stabilized medically, Appellant dictated a detailed statement to the authorities. His statement was consistent with the State's evidence in certain parts, and inconsistent in others. He stated in part that in June 2002, he and his wife divorced and in September he left his home in Detroit, Michigan, on bicycle intending to ride to San Diego, California. He met Kathy Biggs in Depew, Oklahoma, on October 1, 2002. He stayed one day in Depew, then left to continue his bike ride to San Diego. Appellant said when he got to San Diego, he called Kathy and she asked him to come back to Depew for Thanksgiving. Appellant returned to Depew and remained there through December. On December 13, Kathy "threw her husband out of the house" and he and Kathy began a relationship, living together for approximately one month.

¶ 20 Appellant further said that in March 2003, Kathy called him in Detroit and asked him to come and live with her. By the middle of April 2003, they were living in an apartment in Tulsa. Kathy had a nursing job in Lawton and told him he did not need to work. Their relationship was fine until July when problems with her children and money necessitated that he get a job. Appellant said he hitchhiked from Lawton to Tulsa to get his things out of the apartment when he found the locks had been changed. He pried the door open and found his things had been thrown out. Appellant admitted to spending two days in the apartment until the police arrested him for burglary and violation of the protection order. He admitted to throwing out all of Kathy's things in the apartment.

¶ 21 Appellant said he bonded out of jail one day before his preliminary hearing and hitchhiked to Depew. He spent the night in an abandoned car next door to the Cantrells' home. He said that while he was lying in the car, he heard the Cantrells leave their home. He then snuck around the back of the house and went in through an open window. He found a single shot .410 shotgun and shells inside and loaded the gun. While he was in the house, the Cantrells returned. He confronted Mrs. Cantrell first and told her no one was going to get hurt. Mrs.

Cantrell sat down at a table, and a few moments later Mr. Cantrell came in. Appellant said Mr. Cantrell was worried about his wife's heart condition. Both Mr. and Mrs. Cantrell repeatedly asked him what he wanted and offered him their car. Appellant said he talked to Mrs. Cantrell for approximately 20 to 25 minutes during which time she moved to the couch. He said, "Mrs. Cantrell had me talked out of waiting for Kathy to come home. I waited for Kathy to come home to tell her that I was not going to turn her in and that she could quit finding reasons to have me arrested, that I just wanted to get out of there." By this time Mr. Cantrell was sitting in the chair Mrs. Cantrell had just vacated. Appellant walked over to the table, leaned the gun up against the side of the table, and grabbed a glass of water. He then walked back to Mrs. Cantrell and demanded her car keys. Appellant said Mr. Cantrell then grabbed the shotgun and fired, striking Mrs. Cantrell in the back and Appellant in the hand. Appellant said the shot was fired from about 8 to 10 feet. Appellant then lunged at Mr. Cantrell, grabbed the gun and screamed at him, asking why he had fired the gun. Appellant hit Mr. Cantrell on his left side with the butt of the gun. Appellant described a struggle with Mr. Cantrell for the gun and admitted to hitting him in the head with the shotgun numerous times, "until he stopped attempting to get up."

¶ 22 Appellant said he believed Mr. Cantrell was breathing but unconscious. He thought Mrs. Cantrell was dead. He dragged Mr. Cantrell's body to the bathroom first and left him on the floor. He then sat down for about an hour and had a snack. During that time, the phone rang two different times and someone came to the door, knocked a few times then left. Fearing that someone was really trying to get in touch with the victims, he dragged Mrs. Cantrell's body to the bathroom. He could see that Mr. Cantrell was still breathing, so he placed Mrs. Cantrell's body on top, to prevent Mr. Cantrell from rising up. Appellant returned to his snack and thought about a way to get out of there. He had decided to leave when he saw Tyler Montgomery pull up in the driveway across the street. He said was going to force Tyler to tell him where Kathy was.

¶ 23 Appellant said he walked into the front door of the Wright home and told Tyler not to move. But when Tyler got up out of a chair and ran, Appellant fired at him. Appellant saw the shot mark in Tyler's back and Tyler fell to the floor. Appellant said he only meant to hit Tyler in the legs. Appellant saw Kathy's 60-year-old mother, Carla, in the kitchen and heard her scream. He stepped over Tyler's body to enter the kitchen and hit Mrs. Wright with the butt of the shotgun above her left eye. He then hit her two or three more times in the face with his fist. As she fell to the floor, he saw Tyler run out of the house. Appellant said he chased Tyler to his pickup and jumped in the back and Tyler started to drive away.

¶ 24 Appellant admitted reloading the shotgun and firing a shot through the back windshield of the truck in an attempt to hit Tyler. Appellant said Tyler ducked. Appellant said he was only trying to get Tyler to stop the truck. When Tyler drove the truck into the pole, Appellant hit the cab of the truck. After Tyler ran off, Appellant got inside the truck and tried the key but the truck would not start. Appellant started walking when a guy picked him up and asked if he could take him to the hospital. Appellant said he got in the car and told the driver he needed to get some things from home first. But as they drove towards Bristow, the driver stopped at a house Appellant did not know. Appellant said he got out of the car and told the driver he would get himself to the hospital.

¶ 25 Appellant said he knew the police were looking for him and he stayed out in the fields, hiding in straw bales. "After patterning their routes", Appellant left that area and hid out in the woods near Bristow for three or four days. Appellant said he went into a house in Bristow, ate, stole some clothes, left his bloody clothes, and stole a .380 gun. He said he then headed west to the river and followed it for eleven days until he was back in Depew. He said he snuck into the Methodist Church storage building and stayed there for two to three weeks. Appellant said a woman came into the building two or three

times while he was there. On the morning of November 23rd, the woman saw him, screamed and ran out. He said he just walked out of the back door where her keys were still hanging, got in her Toyota and "zigzagged south and east until I ran out of gas in Arkansas."

¶ 26 Appellant said he stood by the car until a doctor and his wife, identified as Sammy and Suzanne, picked him up. He admitted that about a quarter of mile down the road, he pulled out the .380 gun and told them he needed to take their van. Appellant said they told him they did not want to give him their car, that Sammy would drive Appellant wherever he needed. Appellant told them he didn't want to hurt anyone that he just needed to get out of there. He said they drove through Arkansas and into Texas. When they stopped for a break at Diboll, Texas, Sammy fired a gun at Appellant. Appellant said that although he had been shot, he wrestled with Sammy for the gun. Appellant said he hit Sammy in the head twice with the .380 gun because they had lost the gun Sammy used. When Suzanne came to help and asked him not to kill her husband, Appellant hit her in the head with the gun. Appellant said he then drove off in their van. He drove to a convenience store where he was asked about his injuries. When he said he had been shot, the police and an ambulance were called.

¶ 27 As a result of his crime spree, Appellant was convicted of second degree felony murder in Mrs. Cantrell's death, first degree malice murder of Mr. Cantrell, Assault and Battery with a Dangerous Weapon of Mrs. Wright, Shooting with Intent to Kill Tyler Montgomery, and First Degree Burglary of the Wright's home.

¶ 28 In the second stage of trial, the State sought the death penalty as punishment for Mr. Cantrell's murder and presented evidence supporting four aggravating circumstances: 1) during the commission of the murder, the defendant knowingly created a great risk of death to more than one person; 2) the murder was especially heinous, atrocious or cruel; 3) the murder was committed for the purpose of avoiding lawful arrest or prosecution; and 4) at the present time there exists a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society. *See* 21 O.S.2001, § 701.12(2)(4)(5) & (7).

¶ 29 In addition to all of the first stage evidence, which had been incorporated into the second stage, the State presented the testimony of ten witnesses to support the alleged aggravators. These witnesses included Ed Willingham, an investigator with the Creek County District Attorney's Office, who picked up Appellant from the Texas authorities in Paris, Texas, and transported him to Sapulpa, Oklahoma. Willingham testified in part, that during his interview with Appellant, he never expressed any remorse for his crimes, although he said he was not proud of what he had done, and he was angry that none of his victims did what he told them to do. Willingham said that once they were back in Oklahoma, Appellant directed law enforcement to the location of the .410 shotgun and even went with officers to search. The first day's search proved fruitless, but on the second day of searching, the gun was located near a creek. It contained a shell casing which had not been fired. Experts determined the gun had been at that location for approximately four to five weeks.

¶ 30 Another of the State's witnesses was Appellant's ex-wife, Roberta Eizember. She testified she and Appellant, married from 1992 until 2003, lived in Detroit and had two children. She testified that Appellant was an alcoholic, had trouble keeping a job, and had physically abused her on more than one occasion. She said that beginning in May 2002, Appellant became increasingly withdrawn from his family. She testified that she knew nothing about his bicycle trip or time in Oklahoma.

¶ 31 In mitigation, the defense presented eleven witnesses. These included Appellant's co-workers from Detroit, personnel from the Okmulgee County Jail, Appellant's sister and aunt, and two psychologists.

¶ 32 After hearing all of the evidence in aggravation and mitigation, the jury found the existence of two of the aggravators, "great risk of death to more than one person" and that the murder was especially

heinous, atrocious, or cruel and sentenced Appellant to death.

## JURY SELECTION

¶ 33 In his first proposition of error, Appellant contends the trial court erred in failing to excuse for cause Jurors D.B. and J.S. Appellant argues both jurors were biased in favor of the death penalty to such an extent that he was denied a fair and impartial jury.

¶ 34 Jury selection in this case was begun by dividing the prospective jurors into three groups and giving each individual a twelve page juror questionnaire to fill out. The written questionnaires were completed prior to the commencement of oral *voir dire*.[4] Each of the three groups was then selected for a morning or afternoon session devoted to life and death qualification. After all potential jurors had been so qualified, general *voir dire* was conducted until thirty persons had been passed for cause. Then, recalling prospective jurors in the original order, the first twelve were seated in the jury box. Peremptory challenges were limited to those jurors in the box. As peremptory challenges were made, replacements were drawn from the pool of pre-qualified jurors.

¶ 35 After Appellant's portion of the life/death qualification, defense counsel raised challenges for cause to several prospective jurors including Jurors D.B. and J.S. The trial court overruled the challenges. When it came time to exercise peremptory challenges, Juror D.B. took a seat in the jury box as a result of defense counsel's exercise of his eighth challenge. With his ninth peremptory challenge, Appellant removed prospective juror J.L. who was replaced on the panel by J.S. This left both Juror D.B. and Juror J.S. on the jury. After exercising his final peremptory challenge, defense counsel again asked that Juror J.S. be excused for cause based upon his inability to consider all three possible punishments, and based upon the fact that in rescheduling a surgery, counsel surmised "he's just almost too interested in being a juror." The trial court overruled the challenge for cause. Defense counsel then

informed the court that if the defense had been granted additional peremptory challenges, Jurors D.B. and J.S. would be struck from the jury.

¶ 36 In order to properly preserve for appellate review an objection to a denial of a challenge for cause, a defendant must demonstrate that he was forced over objection to keep an unacceptable juror. *Browning v. State*, 2006 OK CR 8, ¶ 8, 134 P.3d 816, 828. This requires a defendant to excuse the challenged juror with a peremptory challenge and make a record of which remaining jurors the defendant would have excused if he had not used that peremptory challenge to cure the trial court's alleged erroneous denial of the for cause challenge. *Id.*

¶ 37 Here, Appellant preserved any error relating to Juror J.S.'s service on the jury. Left with no further peremptory challenges, Appellant appropriately renewed his challenge for cause, requested additional peremptory challenges, and noted for the record which jurors he would excuse with additional peremptories.

¶ 38 As evidence of Juror J.S.'s partiality, Appellant cites to question number 73 on the juror questionnaire. This question asked if the potential juror were the defendant or the State of Oklahoma, "would you want yourself as a juror in this case?" Juror J.S. responded, "no", because "if guilty, he will be on death row and eventually executed." Appellant also directs us to Juror J.S.'s response to question number 66. That question asked, "Do you want to be a juror on this case?" Juror J.S. responded, "yes" "so that justice can be served."

¶ 39 Appellant suggests the responses on the juror questionnaire are sufficient by themselves to excuse a prospective juror for cause based upon his or her views of the death penalty. Our research has yielded no capital cases where responses to pre-trial juror questionnaires, without *voir dire*, have been found sufficient to excuse jurors for cause, based upon their views of capital pun-

---

4. The written questionnaires are included in the original record, thereby making them available for use in our appellate review.

ishment. Indeed, the Supreme Court has warned against oversimplifying the inquiry as to whether jurors can perform their duty notwithstanding their views on the death penalty. "[D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism". *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).

¶ 40 *"Voir dire* examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges". *Mu'Min v. Virginia*, 500 U.S. 415, 431, 111 S.Ct. 1899, 1908, 114 L.Ed.2d 493 (1991). *See also Warner v. State*, 2006 OK CR 40, ¶ 15, 144 P.3d 838, 858. An important aspect of *voir dire* is to educate prospective jurors on what will be asked of them under the law. As the trial court in this case noted, the questionnaires are a means to collect information and are not to be used "as traps" for prospective jurors who have not yet been informed of the law. In our review of the written questionnaires, we have found they did not advise the jury of the law they would be required to follow, nor did they discuss or explain the process the jurors would be required to follow in the punishment phase of trial, *i.e.*, determining if the alleged aggravator or aggravators had been proved beyond a reasonable doubt and then weighing the aggravators and mitigators to determine the appropriate punishment. This very important part of the jurors' duties in a capital case was not even broached until the oral *voir dire*, and then not fully explained until written instructions were given at the close of the second stage evidence. It is the *voir dire* process which allows counsel and court alike to determine whether the prospective jurors can in fact follow their instructions and oath and whether there are grounds to challenge a potential juror. We find the

pre-trial questionnaire cannot trump the actual *voir dire*. The responses to the written questionnaire regarding views on the death penalty are not to be considered in isolation, but in context of the other responses to the questionnaire and oral responses given during *voir dire* in open court.[5] *See Witt*, 469 U.S. at 429, 105 S.Ct. at 855 (the trial judge's "predominant function in determining juror bias involves credibility findings whose bias cannot be easily discerned from an appellate record.") *See also United States v. Chanthadara*, 230 F.3d 1237, 1269 (10th Cir.2000) ("because the jurors are vested with greater discretion in capital cases, the examination of prospective jurors must be more careful than in non-capital cases").[6]

¶ 41 The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt*, 469 U.S. at 424, 105 S.Ct. at 852. *See also Gray v. Mississippi*, 481 U.S. 648, 658, 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). Inherent in this determination is that the potential juror has been fully informed of the law and his or her responsibilities under the law and oath of a juror. This standard does not require a juror's bias be proved with unmistakable clarity; neither must the juror express an intention to vote against the death penalty automatically. *Witt*, 469 U.S. at 424, 105 S.Ct. at 852. "Deference must be paid to the trial judge who sees and hears the jurors". *Id.*, 469 U.S. at 425, 105 S.Ct. at 853. *See also Uttecht v. Brown*, 551 U.S. ——, 127 S.Ct. 2218, 2224, 167 L.Ed.2d 1014 (2007) ("deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the

5. In *Miller–El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) and *Mu'Min v. Virginia*, 500 U.S. 415, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991), both capital cases, the Supreme Court considered the written responses on juror questionnaires in context of *voir dire* in addressing allegations of juror bias, although neither claim concerned a prospective jurors' views on capital punishment.

6. Notwithstanding our application of the law in this case, we urge trial judges to utilize written juror questionnaires as a pre-trial management tool to screen obviously unacceptable jurors and in turn make the *voir dire* process more efficient.

attitude and qualifications of potential jurors").

¶ 42 This Court has adhered to the principles set forth in *Witt*. *See Glossip v. State*, 2007 OK CR 12, ¶¶ 31–33, 157 P.3d 143, 150–151; *Williams v. State*, 2001 OK CR 9, ¶ 10, 22 P.3d 702, 709 (and cases cited therein). We have said the *Witt* standard only requires that each juror be willing to consider each of the three statutory punishments: the death penalty, life imprisonment without the possibility of parole, and life imprisonment (with the possibility of parole). *Glossip*, 2007 OK CR 12 at ¶ 31, 157 P.3d at 150. *See also Williams*, 2001 OK CR 9 at ¶ 10, 22 P.3d at 709–710. Further, all doubts regarding juror impartiality must be resolved in favor of the accused. *Williams*, 2001 OK CR 9 at ¶ 10, 22 P.3d at 709–710. This Court will look to the entirety of the juror's *voir dire* examination to determine if the trial court properly excused the juror for cause. *Id.* As the trial court personally observes the jurors and their responses, this Court will not disturb its decision absent an abuse of discretion. *Id.*[7]

¶ 43 Applying the above principles to the present case, after having been advised of the three possible punishments for a conviction of first-degree murder, Juror J.S. stated unequivocally that he could consider all three punishment options, and follow the law and instructions given to him by the court.[8]

Comparing his statements during *voir dire* with his responses on his written questionnaire, we find his responses do not indicate an intention to disregard or circumvent the law or the court's instructions. As most, his response that "if guilty, [Appellant] will be on death row and eventually executed" indicates a misunderstanding of the law. Such is not sufficient to strike a prospective juror for cause. "If all prospective jurors who did not fully understand the law before the trial began were struck, only lawyers would be allowed to serve on jurys (and only a handful of lawyers at that"). *Brown v. Lambert*, 451 F.3d 946, 952 (9th Cir.2006).

¶ 44 Questions on the written questionnaire regarding the death penalty, without an explanation of or any prospective provided as to the process to be used in determining the appropriate punishment, taint the credibility of any response given. That deficiency was a major flaw in the written questionnaire used in the present case. The jurors in this case needed the benefit of an oral *voir dire* to fully understand the process. The trial court and counsel also needed the oral *voir dire* in order to properly determine a prospective juror's bias.

¶ 45 Appellant also argues that J.S.'s rescheduling of rotator cuff surgery, instead of requesting to be excused for a hardship, indicates the juror was overly eager to serve

---

7. An "abuse of discretion" is defined as a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented. *Stouffer v. State*, 2006 OK CR 46, ¶ 60, 147 P.3d 245, 263.

8. During the State's *voir dire* of J.S. the following occurred:

> MR. LOEFFLER (prosecutor): Mr. S[ ], we're up to you. The three penalties, you heard me talk about them?
> PROSPECTIVE JUROR J.S.: Yes.
> MR. LOEFFLER: No moral, religious, ethical obligations to keep you from returning a sentence of death if you, if you so find that the evidence warrants?
> PROSPECTIVE JUROR J.S.: None.
> MR. LOEFFLER: And if you find the Judge has instructed you that you can do that, you can consider that?
> PROSPECTIVE JUROR J.S.: Yes, sir.
> MR. LOEFFLER: And while it's a very serious matter you could, in fact, impose the death penalty if necessary?

> PROSPECTIVE JUROR J.S.: Yes.
> MR. LOEFFLER: You could consider the other two possibilities of punishment too though, couldn't you?
> PROSPECTIVE JUROR J.S.: Yes, sir.
> MR. LOEFFLER: And those would be equal in your eyes, they would start off at the same starting, starting line like it was a race so- to-speak?
> PROSPECTIVE JUROR J.S.: Yes.
> MR. LOEFFLER: And that would be your answer regardless of what your personal beliefs are for or against the death penalty?
> PROSPECTIVE JUROR J.S.: Right.
> MR. LOEFFLER: Thank you.
> At another point in the *State's voir dire*, J.S. indicated he could follow the court's instructions "for each specific homicide, for each possible aggravating circumstance" and in weighing "those against the mitigators and everything the Court's going to instruct [ ] on". Defense counsel did not ask J.S. any questions regarding his views on capital punishment.

on the jury. Appellant also references Juror J.S.'s response that he had heard about the case in the media.

¶ 46 Contrary to Appellant's argument, the record reflects the juror was not sure about the dates for the surgery and indicated it would not be inconvenient to schedule the surgery to allow him to serve on the jury. J.S.'s response merely indicated a willingness to do his civic duty. If we were to find a prospective juror's willingness to serve on the jury reason for excusal, our judicial system would not survive. Further, during questioning by defense counsel, J.S. indicated he had heard about Appellant's case through the media, but stated he could set aside any preconceived ideas and decide the case based solely on the testimony and evidence introduced during trial.

¶ 47 Having reviewed the entirety of J.S.'s *voir dire,* oral as well as written responses, we have no doubts regarding his ability to be a fair and impartial juror. His responses clearly showed he did not hold views regarding punishment that would prevent or substantially impair the performance of his duty as a juror in accordance with his instructions and oath as a juror. The trial court did not abuse its discretion in denying Appellant's for cause challenge.

¶ 48 As for D.B., Appellant's failure to excuse the juror with an available peremptory challenge waives our review for all but plain error review. Appellant asserts any error was not waived as 1) federal law has pre-empted the Oklahoma law on preservation of error under *United States v. Martinez–Salazar,* 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000); and 2) in using his last peremptory challenge to excuse prospective juror J.L., he was forced to keep D.B., an unacceptable juror.

¶ 49 In *Browning,* 2006 OK CR 8 at ¶ 9, 134 P.3d at 828, this Court held that *Martinez–Salazar* was restricted to cases involving federal criminal procedure, and did not require "any change of course from this Court." Appellant's arguments to the contrary are not persuasive.

¶ 50 Further, while Appellant may have had a difficult choice in deciding whether to excuse prospective juror J.L. or Juror D.B. with his last peremptory challenge, he did have a choice. "A hard choice is not the same as no choice." *Id.,* quoting *Martinez–Salazar,* 528 U.S. at 315, 120 S.Ct. at 781. "Where a defendant is accorded the number of peremptory challenges allowed under the applicable law, he cannot claim his constitutional right to due process was violated." *Id.*

¶ 51 In support of his argument, Appellant directs us to certain responses on the written questionnaire which he claims showed D.B. preferred death and "disdain[ed]" life without parole. Preferring not to limit our review to those few responses selected by Appellant, we look to the entirety of the responses on the written questionnaire regarding the death penalty. The juror questionnaire contains six (6) questions relating to the death penalty. Question No. 42 asked if the prospective juror had ever formed an opinion either in favor or against the death penalty and if so to explain. D.B. wrote, "I firmly believe if you take a life you should lose yours." In Question No. 61, prospective jurors were asked to explain their feelings about the death penalty. Juror D.B. wrote, "I have no reservations about seeing someone put to death so long as it has been proven the person is guilty, especially if they have taken the lives of others." To Question No. 62, which asked "what purpose do you think the death penalty serves in our society?" D.B. responded, "keeps taxpayers from having to support a criminal for the remainder of their life." Question No. 63 asked if the prospective juror thought the death penalty in Oklahoma is used too often. D.B. responded, "definitely not too often." Question No. 64 listed 5 alternatives and the prospective juror was instructed to select the one which best summarized their general views about capital punishment. The choices were as follows:

1. I am opposed to capital punishment under any circumstances.

2. I am opposed to capital punishment except, in a few cases where it may be appropriate.

3. I am neither generally opposed, nor generally in favor of capital punishment.

4. I am in favor of capital punishment, except in a few cases where it may not be appropriate.

5. I am strongly in favor of capital punishment as an appropriate penalty.

D.B. checked the last alternative. Question No. 65 asked the following:

Assume you are on a jury to determine the sentence of a defendant who has already been convicted of a very serious crime. If the law gives you a choice of death or life imprisonment, or some other penalty; (check one)

1. I could not vote for the death penalty regardless of the facts and circumstances of the case.

2. There are some kinds of cases in which I know I could not vote for the death penalty even if the law allowed me to, but others in which I would be willing to consider voting for it.

3. I would consider all of the penalties provided by law and the facts and circumstances of the particular case.

4. I would usually vote for the death penalty in a case where the law allows me to.

5. I would always vote for the death penalty in cases where the law allows me to.

¶ 52 D.B. checked the third alternative that she "would consider all of the penalties provided by law and the facts and circumstances of the particular case." No other questions on the written questionnaire pertained to capital punishment.

¶ 53 Under questioning by the prosecutor during *voir dire*, Juror D.B. said she could consider all three punishment options—the death penalty, life without parole, and life in prison. She said she would do so based on the evidence brought forth in the courtroom and the instructions given by the court. She said she could put aside any personal beliefs or predispositions and decide the case on the evidence, and she did not have any moral, ethical or religious obligations that would keep her from doing so.

¶ 54 Under questioning by defense counsel, Juror D.B. reiterated that she could consider all three possible punishments. When specifically asked if she could consider a life sentence if the defendant was found guilty of intentional murder, she replied, "I could consider a sentence of life." Defense counsel then asked if her consideration "would be any more meaningful than my consideration of moving furniture?" She replied, "yes." Defense counsel's *voir dire* of D.B. continued as follows:

MR. CORGAN (defense counsel): . . . How about the sentence of life without parole, could you consider that as well?

PROSPECTIVE JUROR D.B.: If the death penalty was not an option.

MR. CORGAN: Okay, tell me what you mean by that.

PROSPECTIVE JUROR D.B.: If they're in prison for the remainder of their life without the possibility of parole why not the death penalty?

MR. CORGAN: All right, so are you, are you telling me then that if you had a situation where it was laid out on the table, life, life without parole or death, then you would automatically consider one of those?

PROSPECTIVE JUROR D.B.: Automatically consider one of—

MR. CORGAN: One of those punishments over the others?

PROSPECTIVE JUROR D.B.: Probably.

MR. CORGAN: And—

PROSPECTIVE JUROR D.B: Yes.

MR. CORGAN: And that would be death?

PROSPECTIVE JUROR D.B: Yes.

MR. CORGAN: So—

PROSPECTIVE JUROR D.B: Let me get you, you said that the evidence had already been there and it's over and it's the penalty phase, right?

MR. CORGAN: When we talk about punishment you've already made the determination of intentional murder beyond a reasonable doubt, okay?

PROSPECTIVE JUROR D.B: Uh-huh.

MR. CORGAN: That's where we are. Within that context are you telling me that you would automatically say it should be the death penalty?

PROSPECTIVE JUROR D.B: I would have to look at all three but just off the cuff, it would probably be death.

MR. CORGAN: And do you feel that you could give meaningful consideration to life?

PROSPECTIVE JUROR D.B: Yes.

MR. CORGAN: Do you feel that you could give meaningful consideration to life without parole?

PROSPECTIVE JUROR D.B: I would have to try hard.

MR. CORGAN: Okay and I appreciate that answer. In trying hard if you and my client were to switch places today and you were on trial would you want a juror with that type of mindset?

PROSPECTIVE JUROR D.B: Personally, yes.

MR. CORGAN: Okay.

PROSPECTIVE JUROR D.B: Okay.

MR. CORGAN: Do you feel like—

PROSPECTIVE JUROR D.B: I would not want to spend my life in prison without the possibility of parole.

¶ 55 Later during *voir dire*, defense counsel asked the panel if they understood that if the State does not prove an aggravating circumstance to the jury's satisfaction beyond a reasonable doubt then the jury would not be allowed to consider the option of death. When specifically asked if she understood, Juror D.B. replied, "if it's not an option I wouldn't have a problem with it" and that she could consider the other two punishments of life and life without parole. This was the extent of Juror D.B.'s *voir dire* on her views of capital punishment.

¶ 56 Reviewing D.B.'s responses in total, her responses do not demonstrate an impossible bias towards the death penalty. Individual responses read in isolation may suggest such a bias as Appellant claims. However, other responses indicate Juror D.B. could be a fair and impartial juror. This situation points out the importance of the oral *voir dire*. Although the juror questionnaire mentioned there were three possible punishments for a conviction for intentional murder, no options other than the death penalty were addressed. The questionnaire did not explain the law regarding proof of aggravators or weighing of the mitigating evidence against the aggravators. Despite these omissions, D.B. indicated she could consider all punishment options. It was not until *voir dire*, and specifically questioning by defense counsel, that the juror's views on the other punishment options were explored. D.B. did not say she would automatically consider the death sentence. Her response that "off the cuff" she would consider death as punishment for intentional murder does not indicate a predisposition toward the death penalty, but rather illustrates a "gut reaction." We are confident that any determination made during jury deliberations would be an informed decision and not merely "off the cuff."

¶ 57 As further evidence of her partiality, Appellant cites to Juror D.B.'s failure to state that she could "fairly" consider all three punishment options. *See Hanson v. State*, 2003 OK CR 12, ¶ 10, 72 P.3d 40, 48 ("that single word [fairly] carries an inescapable constitutional weight".) [9] Here, the court asked the entire panel whether they could give "fair consideration" to each punishment option. That neither the prosecutor nor defense counsel used the term "fairly consider" in their examination of the juror is not grounds for a finding of partiality. Juror D.B.'s responses suggest she might have trouble considering all three options equally. However, that is not the standard required

9. In *Hanson*, this Court found it significant that prospective juror Fulfaro was not asked if he could "fairly" consider all three punishment options. 2003 OK CR 12, ¶ 10, 72 P.3d at 48. However, this Court's decision to find an abuse of discretion in failing to remove the prospective juror for cause was based upon the entirety of the prospective juror's *voir dire*. The responses given by prospective juror Fulfaro were much different than those given by Juror J.B. in the present case. For example, Fulfaro stated in part he could follow the law and consider all three punishments for murder, he believed that defendants had their day in court but victims' rights were forgotten; he believed in "an eye for an eye"; approved of the strict punishments found in Middle Eastern countries, life and life without parole were significant but not adequate punishments for premeditated murder, and he would only consider death for that crime. 2003 OK CR 12 at ¶ 9, 72 P.3d at 48.

by law. To withstand a challenge for cause concerning punishment issues, a venireperson need only be willing to consider all the penalties provided by law and not be irrevocably committed to any one punishment option before the trial has begun. *Gilbert v. State*, 1997 OK CR 71, ¶ 26, 951 P.2d 98, 108. Here, Juror D.B. indicated she could consider all possible punishment options. Any ambiguities in D.B.'s responses or questions as to her ability to be a fair and impartial juror were for the trial court to resolve. Having the benefit of observing D.B.'s demeanor throughout *voir dire*, the court found her responses credible and insufficient to excuse her for cause. Our review of the totality of her *voir dire*, written and oral responses, supports the trial court's finding that Juror D.B. did not have such a strong bias towards the death penalty that the performance of her duties as juror would be prevented or substantially impaired. Accordingly, the trial court did not abuse its discretion in refusing to remove her for cause.

¶ 58 In Proposition II, Appellant asserts the trial court abused its discretion in failing to remove prospective juror A.S. for cause. Unlike Jurors D.B. and J.S., A.S. did not ultimately serve on the jury as Appellant used his eighth peremptory challenge to excuse the prospective juror. Appellant argues, as he did at trial, that the prospective juror could not consider all three punishment options and that he was "pro death". Appellant asserts on appeal that A.S. "exhibited a state of mind that should have satisfied the court that he could not try the case impartially, without prejudice to the substantial rights of the party making the challenge."

¶ 59 In his written questionnaire, A.S. set out his opinion on the death penalty in Question No. 42 by writing; "if a person is convicted of a capital crime, I believe the death penalty should be carried out." Explaining his feelings about the death penalty in Question No. 61, A.S. wrote: "[i]f the defendant is found guilty of a capital crime I feel the death penalty should be carried out after an appeal." As for the purpose the death penalty serves in our society, A.S. wrote; "it rids society of the expense of housing & feeding & medical care for the rest of his or her life."

He indicated that he thought the death penalty was not used to often or too seldom, but "just about right." He indicated the 4th alternative, that he was "in favor of capital punishment, except in a few cases where it may not be appropriate" best summarized his general views on capital punishment. In Question No. 65 he indicated that if he was given the choice of death or life imprisonment or some other penalty, he would "usually vote for the death penalty in a case where the law allows me to."

¶ 60 During *voir dire* questioning by the prosecution, prospective juror A.S. said he could impose all three punishments based on the evidence; however he "would lean more toward death or life without parole". When asked if he would consider life in prison, A.S. replied, "if the judge instructs me to, yes, sir, I could". The prosecutor then asked the prospective juror whether, despite certain predispositions he might have, he could go ahead and base his decision on the evidence and the instructions from the court rather than personal bias or feelings he might have regarding the punishment options. A.S. replied that he could.

¶ 61 Given the scenario by defense counsel that guilt had been determined and punishment was the only issue, A.S. said he could not consider life in prison. When asked to explain his answer, the prospective juror said, "as it's been pointed out earlier life imprisonment could be twenty years for a heinous crime, given good time and to me that's not just punishment for a crime that severe." The following exchange then occurred between defense counsel and the prospective juror:

MR. CORGAN [defense counsel]: ... if we get that far Judge Vassar will say jury, you are to consider life, life without parole and death, do I understand your answer to be, sir that if you had made a determination that this was intentional murder you just flat out could not consider life?

PROSPECTIVE JUROR A.S.: No, sir, I couldn't.

MR. CORGAN: And, sir, with that mindset do you feel it would be better if you did not sit on this case as a juror?

PROSPECTIVE JUROR A.S.: No, I feel I can be eligible to sit on this case as a juror and judge all the evidence.

MR. CORGAN: Even though that you could not consider the option of life?

PROSPECTIVE JUROR A.S.: That would be my third choice obviously, that would be the lesser of the three choices. It would be, I would be having to vote with eleven other folks and listen to all of their, their evidence. That would be down on my list on the choices, let's put it that way.

MR. CORGAN: All right, sir, but are you telling me now that you could consider that?

PROSPECTIVE JUROR A.S.: I could consider it, I'm not trying to back track or anything but I could consider that.

MR. CORGAN: All right, sir, what about the punishment of life without parole?

PROSPECTIVE JUROR A.S.: That would be a better option for me based on the evidence if the evidence proves to be true.

¶ 62 Later during *voir dire,* the court asked all of the panel members if they had heard about the case in the media and if anything they had heard would influence them as they sat as a juror. A.S. said he had read about the case in the newspaper but it had not influenced his opinion.

¶ 63 When read in isolation, certain responses by A.S., both in his written questionnaire and oral *voir dire,* seem to indicate some partiality. However, when read in context of the remaining *voir dire,* his responses indicate his personal views on capital punishment. Responses on the written questionnaire indicating general support for the death penalty and the personal view that harsher punishment is necessary to rectify the burgeoning crime problem in society do not reflect an inherent bias against Appellant or in favor of the death penalty. A.S. stated at least four times he could follow the court's instructions and consider all punishment options. Capital jurors are not to be struck for cause unless they are unable to follow the court's instructions. *Gray,* 481 U.S. at 658, 107 S.Ct. at 2051. In light of A.S.'s verbal responses that he could set aside any personal beliefs and judge the case based on the evidence presented at trial, that he could consider all punishment options and would follow the law as instructed by the court, his written responses expressing his personal views do not warrant removal for cause. *See Gilbert,* 1997 OK CR 71, at ¶ 27, 951 P.2d at 109 ("a juror's personal beliefs are not grounds for removal for cause if that juror states he or she can set aside those personal beliefs and judge the case before them on the law and evidence as presented"). *See also Gray,* 481 U.S. at 658, 107 S.Ct. at 2051 (even jurors "who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law" quoting *Lockhart v. McCree,* 476 U.S. 162, 176, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137 (1986)).

¶ 64 Any doubts regarding the ability of A.S. to be a fair and impartial juror were resolved by the trial court. Responses which, on the written record of appeal, may seem to substantially impair a prospective juror's ability to follow the law, may not appear the same to the trial judge who sees and hears the responses first hand. Here, the record supports the trial court's finding. Therefore, the trial court did not abuse its discretion in denying the for cause challenge, and this assignment of error is denied.[10]

---

10. The deficiency of the juror questionnaires in this case in failing to inform and inquire if the potential jurors could follow the process required in the penalty phase of a capital trial reveals the importance of the trial judge explaining the process during *voir dire.* At the present time, the trial judge only inquires of potential jurors whether they can consider all three possible punishment options. *See* Oklahoma Uniform Jury Instructions—Criminal (2d) (OUJI–CR) 1–5. We request the OUJI–CR Instruction Committee to expand that introductory instruction to have the trial judge inform prospective jurors of the process they will be directed to follow by the final instructions and elicit a response as to their ability to follow that process, *i.e.,* the requirement that the State must prove beyond a reasonable doubt one or more aggravators and then the jury is to weigh the aggravating evidence against the mitigating evidence to determine the appropriate punishment.

¶ 65 In his third proposition of error, Appellant contends the trial court erred in failing to correct prospective jurors' misconceptions about the meaning of life without the possibility of parole and in failing to remove the jurors tainted with misinformation. Appellant directs us to the life/death qualification of the second group of prospective jurors wherein prospective juror P.M., a former federal correctional officer, asked the prosecutor about the meaning of a life sentence. P.M. commented that although he had worked in the federal system he had heard that in the state system life meant twenty years, that in some cases he had heard of people getting out in seven years with "good time and all that stuff", and that he thought life was "twenty years and then with good time they'd get out in ... two-thirds of their time or something". The prosecutor replied that "life is life in prison without the possibility of parole", he didn't know if someone could get out in seven years, the jury had no control once the defendant was sentenced to the Department of Corrections, and a defendant could get out of prison or they could die prison, "it just depends".[11]

¶ 66 Appellant argues this exchange between the prosecutor and P.M. tainted the entire second panel of prospective jurors so that they could not seriously consider the punishment option of life in prison. Appellant asserts the trial court should have taken curative measures such as continuing the examination of P.M. outside the hearing of the other jurors, excusing the entire second group, or instructing the prospective jurors that the law requires a defendant convicted of first degree murder must serve 85% of a life sentence before being considered for parole.[12] Appellant also contends the trial court failed to take advantage of the opportunity to instruct the jury on the "85% Rule" when it denied Appellant's requested instruction at the close of evidence and when it failed to reference the rule in its response to

a question from the jury during deliberations. These last two claims are fully addressed in Proposition IV.

¶ 67 The manner and extent of *voir dire* is within the discretion of the trial court whose rulings will not be disturbed on appeal absent a clear abuse of discretion. *Hogan v. State*, 2006 OK CR 19, ¶ 13, 139 P.3d 907, 917; *Patton v. State*, 1998 OK CR 66, ¶ 9, 973 P.2d 270, 280. No abuse of discretion will be found so long as the *voir dire* is conducted in a manner which affords the defendant a jury free of outside influence, bias or personal interest. *Id.*

¶ 68 Initially, the record suggests the trial court did not take the remedial measures now suggested by Appellant as defense counsel appeared to agree with the court's handling of the situation. During the prosecutor's exchange with prospective juror P.M., defense counsel raised no objections. While defense counsel did raise a challenge for cause as to the entire second panel due to P.M.'s responses, defense counsel at no time requested any type of cautionary instruction or 85% instruction. Acting *sua sponte*, the court advised the members of the second panel as follows:

Now I think we have got this seven or eight years floating around but there is just one figure missing and I am not, no one knows what life means, okay? We, all we tell you is life means life. That is all that we are allowed to say, all right but I certainly don't want to represent that there is some other figure, a magic figure and I don't know where seven or eight years came from ... [13]

¶ 69 The court's failure to individually *voir dire* P.M. once he began talking about the meaning of life in prison does not warrant relief. Whether to conduct individual *voir dire* is within the trial court's discretion. *Childress v. State*, 2000 OK CR 10, ¶ 40–41, 1 P.3d 1006, 1015. P.M. was not the only

---

11. (Tr. Vol.1, pgs.200–201).

12. 21 O.S.Supp.2003, § 13.1, the so-called "85% Rule," limiting parole eligibility for certain offenses, including murder. In *Anderson v. State*, 2006 OK CR 6, ¶ 25, 130 P.3d 273, 283, this Court concluded that the 85% Rule is a "specific

and readily understood concept of which the jury should be informed" when sentencing defendants for qualifying offenses.

13. (Tr. Vol.2, pg.260).

person to comment on the meaning of a life sentence. The subject was addressed by the court, counsel, and other prospective jurors. However, the common theme of all these comments was that no one could precisely define the meaning of a life sentence. Any individual *voir dire* of P.M. would not have precluded him from these comments and questions. Therefore, the trial court did not abuse its discretion in failing to conduct individual *voir dire*.[14]

¶ 70 Further, the trial court did not abuse its discretion in denying Appellant's challenge for cause and excusing the entire second group based upon concerns that "a vast majority of those people will not realistically consider all three options."[15] "Any claim of jury partiality must focus on the jurors who ultimately sat." *Rojem v. State*, 2006 OK CR 7, ¶ 36, 130 P.3d 287, 295. Five people from the second group, J.S., D.B., G.P., R.B., and A.B. ultimately sat on Appellant's jury. It is clear from their responses, both written and oral, that each of these jurors could be a fair and impartial juror, consider all three penalty options, and follow the law and instructions given by the court.

¶ 71 The record suggests the trial court did not *sua sponte* issue an instruction during *voir dire* on the 85% Rule because at the time of the trial in this case, the long standing rule was that the trial court should not comment or instruct the jury on parole eligibility. *Anderson*, 2006 OK CR 6 at ¶ 11, 130 P.3d at 278. Since the trial in this case, this Court has held that juries should be informed of the applicability of 21 O.S.Supp. 2003, § 13.1. *Id. See also Carter v. State*, 2006 OK CR 42, ¶ 4, 147 P.3d 243, 244. However, the failure to do so is not grounds for automatic reversal. *Id.*, 2006 OK CR 42, at ¶ 5, 147 P.3d at 244. *See also Roy v. State*, 2006 OK CR 47, ¶ 26, 152 P.3d 217, 226.

¶ 72 "The purpose of *voir dire* examination is to ascertain whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges." *Black v. State*, 2001 OK CR 5, ¶ 15, 21 P.3d 1047, 1057; *Patton*, 1998 OK CR 66, at ¶ 9, 973 P.2d at 280. The record clearly shows defense counsel was allowed sufficient *voir dire* of the second panel to determine if there were grounds to challenge a particular juror for cause and to intelligently exercise peremptory challenges. The response of each of the five individuals from the second panel who served on the jury showed they could consider all three punishment options and that each understood that a life sentence was something different from a sentence of life without the possibility of parole and a sentence of death. Any isolated comments regarding parole or parole eligibility were not sufficient to deny Appellant a fair trial. *See Wade v. State*, 1992 OK CR 2, ¶ 15, 825 P.2d 1357, 1361–62 (prospective juror's comment that she could not fairly consider life imprisonment as a possible punishment, "because in Oklahoma a life sentence usually doesn't turn out that way" found to be an "unfortunate" comment, but not grounds for reversal as each juror empanelled and sworn to try appellant's case stated that they could be impartial and give appellant a fair trial).

¶ 73 The failure of the court to advise the jury, during *voir dire*, that if convicted of murder, a defendant must serve 85% of his sentence before being considered for parole did not result in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right. 20 O.S.2001, § 3001.1. This assignment of error is therefore denied.

## FIRST STAGE ISSUES

¶ 74 In his eighth assignment of error, Appellant argues the trial court committed

14. Appellant compares his case to *Lambert v. State*, 2005 OK CR 26, 126 P.3d 646, where this Court granted post-conviction relief in part because during the retrospective mental retardation hearing, the jury heard evidence of the crimes for which Lambert was convicted contrary to this Court's order. *Lambert* is distinguishable from the present case as defense counsel in that case repeatedly objected during *voir dire* to references to detailed information regard-

ing the defendant's crimes. Further, in *Lambert*, this Court held the trial court's failure to individually *voir dire* resulted in a tainted jury panel. *Id.*, 2005 OK CR 26, at ¶¶ 14–16, 126 P.3d at 654. In the present case, the failure to grant individual *voir dire* did not result in a tainted panel.

15. (Tr. Vol. 2, pg. 277).

reversible error by admitting irrelevant and prejudicial evidence of other crimes and bad acts. Specifically Appellant complains about the following evidence: 1) Appellant's affair with Kathy Biggs and his lies about his ex-wife and children; 2) Appellant's second degree burglary of Kathy Biggs' Tulsa apartment and his threat to "get even" with her; 3) Appellant's discharge of the weapon during a struggle with John Inman shortly after shooting Tyler Montgomery and beating Carla Wright; 4) burglaries committed by Appellant while on the run in the woods of Creek County; and 5) the kidnapping and beating of Sam and Suzanne Peebles.

■■■ ¶ 75 Title 12 O.S.2001, § 2404(B) prohibits the admission of evidence of "other crimes, wrongs, or acts" to prove the character of a person in order to show action in conformity therewith absent one of the specifically listed exceptions. An act that is not a violation of the criminal law is nonetheless governed by § 2404(B) where it carries a stigma that could unduly prejudice an accused in the eyes of the jury. *Freeman v. State*, 1988 OK CR 192, ¶ 3, 767 P.2d 1354, 1355. When the State seeks to introduce evidence of a crime other than the one charged, it must comply with the procedures in *Burks v. State*, 1979 OK CR 10, ¶ 2, 594 P.2d 771, 772, *overruled in part on other grounds, Jones v. State*, 1989 OK CR 7, 772 P.2d 922. *See Holt v. State*, 1989 OK CR 21, ¶ 4, 774 P.2d 476, 477. *Burks* requires, in part, the State to give a pre-trial notice of the other crimes or bad acts evidence it intends to introduce. "The purpose of the notice requirement is to prevent surprise on the part of the defense and to allow time for the defense to be heard prior to the evidence being placed before the jury." *Warner v. State*, 2006 OK CR 40, ¶ 65, 144 P.3d 838, 868. Except where specifically noted, the other crimes evidence now complained of in the present case was included in the State's pre-trial notice of other crimes evidence.

■■■ ¶ 76 "To be admissible, evidence of uncharged offenses or bad acts must be probative of a disputed issue of the crime charged, there must be a visible connection between the crimes, evidence of the other crime(s) must be necessary to support the State's burden of proof, proof of the other crime(s) must be clear and convincing, the probative value of the evidence must outweigh the prejudice to the accused and the trial court must issue contemporaneous and final limiting instructions." *Lott v. State*, 2004 OK CR 27, ¶ 40, 98 P.3d 318, 334–335. "When other crimes evidence is so prejudicial it denies a defendant his right to be tried only for the offense charged, or where its minimal relevancy suggests the possibility the evidence is being offered to show a defendant is acting in conformity with his true character, the evidence should be suppressed." *Id.*

■■■ ¶ 77 Evidence of bad acts or other crimes may also be admissible where they form a part of an "entire transaction" or where there is a "logical connection" with the offenses charged. *Neill v. State*, 1994 OK CR 69, ¶ 36, 896 P.2d 537, 550–551. "This *res gestae* exception differs from the other listed exceptions to the evidence rule; in that in the listed exceptions, the other offense is intentionally proven, while in the *res gestae* exception, the other offense incidentally emerges." *Id.* "Evidence is considered *res gestae*, when: a) it is so closely connected to the charged offense as to form part of the entire transaction; b) it is necessary to give the jury a complete understanding of the crime; or c) when it is central to the chain of events." *Warner*, 2006 OK CR 40, at ¶ 68, 144 P.3d at 868.

■■■ ¶ 78 John Wright testified to the circumstances surrounding Appellant's arrival in Depew and his introduction of Appellant to his daughter and son-in-law. Mr. Wright also testified that by December 2002, Appellant and Kathy Biggs had developed a romantic relationship while Appellant stayed at the Biggs' residence in Depew. Mark Biggs also testified to the circumstances surrounding his introduction to Appellant in September 2002. He stated that in November 2002, at Carla Wright's request, he picked Appellant up at the bus station. Mark Biggs testified that Appellant told him that his wife and children had been killed in a traffic accident. Biggs stated that on December 13, 2002, Appellant told him that he and Kathy

were in love and that he was going to get a court settlement from a trucking company for eight million dollars and that Appellant basically wanted to buy Biggs out so he would leave. Biggs said he filed for divorce on December 21, 2002.

¶ 79 No objection was raised by Appellant to Wright's testimony, at trial or now on appeal. In his appellate brief, Appellant admits Wright's testimony was necessary to establish the motive in this case. However, he argues that Biggs' testimony was not relevant to establishing a motive in this case and "is nothing but bad character evidence". At trial, defense counsel raised this same objection. While expressing a bit of skepticism about the relevance of the testimony, the court nevertheless overruled the objection and admitted the testimony.

¶ 80 Portions of Biggs' testimony concerning the relationship between Appellant and Kathy Biggs were cumulative to Wright's testimony. However, Biggs' testimony went into details not testified to by Wright, namely that it was Appellant who asked Biggs to move out, thus paving the way for Appellant to be with Kathy. Biggs' testimony concerning Appellant's statement about his wife and children illustrated how Appellant talked his way into the Wright and Biggs families and how he came to stay with the Biggs family over the Thanksgiving holiday and into early December—the time when the affair between Appellant and Kathy began.

¶ 81 No pre-trial notice of the evidence was given. However, none was required as the evidence was part of the *res gestae* of the offenses on trial as it incidentally emerged as Mark Biggs described how Appellant came to be in Depew, Oklahoma. The evidence was necessary to give the jury a complete understanding of the events they were to hear about during the trial. The cumulative nature of the evidence was not so great as to be unfairly prejudicial.

¶ 82 Kathy Biggs testified to the circumstances surrounding the burglary of her Tulsa apartment. Appellant argues the estranged nature of their relationship was presented through other witnesses and the State had no legitimate need to introduce evidence of an unrelated burglary occurring well before the crimes on trial.

¶ 83 Appellant's motive in committing the crimes on trial was to punish or "get even" with Kathy Biggs. To say that the reason behind this motive was their estranged relationship is to put it too simply. The estranged relationship plus Appellant's anger at the burglary charges and his inability to retain control over Kathy fueled his motive. Evidence of the burglary of Kathy Biggs' Tulsa apartment was relevant in proving his intent to harm her. That the jury may have heard from more than one witness that Appellant and Kathy were estranged was not so prejudicial as to unfairly impact the outcome of the trial. Further, evidence of the Tulsa burglary also showed that Appellant's presence in Depew on October 18, 2003, was not an accident, that he planned to be in Kathy's hometown, and that he "didn't just show up . . . out of the clear blue sky." [16]

¶ 84 Additionally, the trial court limited evidence of the burglary only to that necessary to establish Appellant's motive and intent. When Kathy Biggs testified she discovered that adult movies had been ordered "almost continuously for the last 24 to 36 hours" at the apartment, presumably by Appellant, the trial court sustained defense counsel's hearsay objection and admonished the jury to disregard the testimony. Further, the trial court agreed that evidence of the extensive damage Appellant did to the apartment could be presented by stipulation instead of witness testimony.

¶ 85 Appellant also challenges the testimony of "jailhouse snitch" Joel Weinstock. Mr. Weinstock was arrested for Driving Under the Influence (DUI) and held in the Tulsa County Jail overnight. He was placed into the cell occupied by Appellant, who was jailed on the charges stemming from the burglary of Kathy Biggs' Tulsa apartment. Weinstock testified that Appellant told him his girlfriend was a "pharmaceutical rep.", that she was dealing drugs, and that he was going to "get even" with her.

---

**16.** (Tr.Mtn.Hrg. 1/26/05, pg. 11).

¶ 86 Mr. Weinstock was not a "jailhouse snitch" or "jailhouse informant" within the context of *Dodd v. State*, 2000 OK CR 2, 993 P.2d 778. *See Wright v. State*, 2001 OK CR 19, ¶ 21, 30 P.3d 1148, 1152. Weinstock, a professional hairstylist, had never been to jail before his DUI arrest and at the time of trial, had not been back to jail. There is no evidence of any deal between the State and Weinstock in exchange for Weinstock's testimony, nor is there any evidence Weinstock "preyed" on Appellant in any manner. Even so, out of an abundance of caution, the trial court issued a cautionary instruction to the jury pursuant to the Oklahoma Uniform Jury Instructions–Criminal (OUJI–CR (2d)) 9–43A. As Appellant's intent in committing the crimes on trial was the main issue in the case, Weinstock's testimony was relevant in rebutting Appellant's contention that he did not intend to kill or harm the Cantrells or Tyler Montgomery.

¶ 87 Appellant also argues that Kathy Biggs was not a victim in this case therefore evidence of past altercations between the two of them was not admissible to prove motive or intent for the homicides and assaults in this case. Evidence of previous altercations between spouses is relevant to the issue of intent. *Harris v. State*, 2004 OK CR 1, ¶ 35, 84 P.3d 731, 747; *Hooker v. State*, 1994 OK CR 75, ¶ 225, 887 P.2d 1351, 1359. This has been extended to individuals in a close or dating relationship. *Short v. State*, 1999 OK CR 15, ¶ 40, 980 P.2d 1081, 1096.[17] Although Kathy Biggs was not physically injured in Appellant's crime spree, she was his ultimate target. Therefore, evidence of his threats and prior violent conduct toward her was relevant in showing his motive, intent, and that his threats to hurt her and her family were not merely idle talk.

¶ 88 Appellant's comparison of his case to *United States v. Hogue*, 827 F.2d 660 (10th Cir.1987) is unavailing. In *Hogue*, the defendant was tried for the stabbing death of a neighbor. The prosecution introduced evidence of prior domestic abuse by the defendant against his wife and children to establish absence of mistake or accident. The Tenth Circuit found the murder of the neighbor was separate and unrelated to the domestic abuse; therefore the other crimes evidence was not admissible. In the present case, evidence of the Tulsa burglary and Appellant's various threats to harm Kathy Biggs explained why he was in Depew on October 18, 2003, and why he went to the Cantrells' home and the Wright's home. The burglary and threats were directly related to the crimes committed in Depew.

¶ 89 Appellant also challenges testimony by Kathy Biggs that Appellant "wouldn't stop" when he choked her. This testimony was elicited during re-direct examination to clarify Biggs' testimony on cross-examination that after the Tulsa burglary, Appellant phoned and told her "he wouldn't stop until he was finished". This was not other crimes evidence included in the State's pre-trial notice, but *res gestae* of the Depew crimes as it helped give the jury a more complete picture of the circumstances comprising the crimes on trial.

¶ 90 Appellant directs us next to testimony by John Inman. Appellant asserts that testimony by Inman to the circumstances surrounding his picking Appellant up after the crash at the Depew football field, "might arguably constitute part of the *res gestae* of the crime, the allegation that Appellant fired the shotgun at Mr. Inman was totally unnecessary and highly prejudicial."

¶ 91 Appellant's pointing of the firearm was included in the State's pre-trial notice. The evidence was relevant in showing Appellant's possession and use of the murder weapon was not accidental. Further, Inman's entire testimony regarding his encounter with Appellant was admissible as *res gestae* as it was so closely connected to the

---

17. In *Short*, the defendant had repeatedly threatened to kill his girlfriend and her family. Early one morning the defendant threw an explosive device at his girlfriend's apartment. The device ignited, burning the girlfriend's apartment and the one above it. The girlfriend escaped but the man in the upstairs apartment died in the fire. Although the defendant's girlfriend and her family were not murder victims, this Court held that evidence of the defendant's threats to kill and burn up his girlfriend and her family was relevant to proving his motive and intent in firebombing the apartment. 1999 OK CR 15, at ¶¶ 37–40, 980 P.2d at 1097.

charged offenses as to form a logical connection and was necessary to give the jury a complete picture of the events on trial. *See Walker v. State,* 1980 OK CR 13, ¶¶ 9–10, 608 P.2d 1156, 1158. "The State is permitted to re-create the circumstances known to the witnesses that occurred simultaneously with the crime and incidental to it as part of the *res gestae* of the crime". *McElmurry v. State,* 2002 OK CR 40, ¶ 63, 60 P.3d 4, 21–22.

¶ 92 Appellant also complains the prosecutor "embellished" Inman's testimony during closing argument. In the absence of any objection from the defense we review for plain error only, and find none. *See Bland v. State,* 2000 OK CR 11, ¶ 89, 4 P.3d 702, 726. A review of the record shows the comments were reasonable inferences on the evidence. Whether Mr. Inman's testimony is considered admissible as a § 2404 exception or as *res gestae,* it was properly admitted and its probative value was not outweighed by the danger of unfair prejudice.[18]

¶ 93 Appellant argues next that evidence of the burglaries he committed while eluding police was inadmissible as they were neither connected to nor facilitated by the Cantrell murders and amounted to nothing more than mere irrelevant and highly prejudicial character evidence.

■ ¶ 94 The mere fact that an accused commits more than one crime in a defined period of time is not *by itself* sufficient to admit other crimes evidence. *Knighton v. State,* 1996 OK CR 2, ¶ 36, 912 P.2d 878, 889. The evidence must be admissible under § 2404(B) or as *res gestae. Id.* Evidence of Appellant's actions after leaving John Inman's car in an attempt to evade capture by police was probative of his intent and motive to commit the crimes in Depew and evade responsibility for their commission. *See Walker,* 1980 OK CR 13, ¶ 10–12, 608 P.2d at 1158 ("testimony of the officers concerning the events which transpired subsequent to the actual robbery up to and through his

apprehension did have probative value on his motive, intent, the absence of mistake or accident, and upon the identity of the defendant as the one who committed the robbery").

¶ 95 Despite Appellant's confession to the crimes in Depew, the State still bore the burden of proving guilt beyond a reasonable doubt. Evidence of the burglary at Rodney Lewis's home four days after the crimes in Depew was relevant on the issue of identity of Appellant as the perpetrator of those crimes.

¶ 96 Evidence that after the Lewis burglary, Appellant went to Kathy Biggs' former residence and other abandoned trailers before camping in a shack near the Biggs' former residence was admissible as part of the *res gestae* of the Depew crimes. Despite claims that Appellant went to the above places to find food and water, the evidence also suggests Appellant was returning to Depew to find and potentially harm Kathy Biggs' and her family. Evidence that Appellant broke into the Methodist Church storage building and subsequently stole Ms. Pitre's car in order to leave Depew was all part of Appellant's attempts to escape apprehension and was all part of the *res gestae* of the crimes in Depew. Without this evidence, inexplicable gaps in time would have left the jury without a clear picture of the events surrounding Appellant's crimes.

■ ¶ 97 Finally, Appellant complains about evidence of the kidnapping and assault of Samuel and Suzanne Peebles. Defense counsel's objection to the admission of this evidence was overruled. Now on appeal, Appellant admits that Mrs. Peebles' testimony that Appellant told her "that old man did the same thing and I killed his wife" might have some relevance to his intent as to Mrs. Cantrell's homicide, but argues there was no legitimate need to bring out the entire incident for that single statement.

---

18. As relevant to showing Appellant's intent, motive, and absence of mistake, Inman's testimony was sufficient to establish by clear and convincing evidence that Appellant discharged the weapon. *See Lott,* 2004 OK CR 27, at ¶ 40, 98 P.3d at 334–335 (discussing *Burks* requirements for oth-

er crimes evidence). If admitted as part of the *res gestae* of the offenses on trial, the evidence was not subject to the clear and convincing requirement. *Id. See also Fontenot v. State,* 1994 OK CR 42, ¶ 48, 881 P.2d 69, 83, n. 18.

¶ 98 Evidence of the Peebles' kidnapping was included in the State's notice of other crimes evidence. Appellant's statement to Mrs. Peebles emerged incidentally as she related the circumstances of the kidnapping. Appellant's actions in deceiving the Peebles so they would pick him up and his subsequent kidnapping of them at gunpoint was relevant in showing his intent and motive in evading responsibility for the crimes in Depew. While evidence of flight is not always admissible, this Court has upheld the admission of other crimes evidence when the other offenses were crimes which led to the appellant's apprehension and arrest. *Neill,* 1994 OK CR 69, at ¶ 37, 896 P.2d at 551.

¶ 99 Having fully reviewed Appellant's challenges to the other crimes evidence, we find the probative value of this evidence was not outweighed by the danger of unfair prejudice. *See* 12 O.S.2001, § 2403. Further, at the close of evidence, the trial court issued a limiting instruction directing the jury that evidence of other crimes or bad acts was not to be considered proof of guilt or innocence of the offenses on trial, but was to be considered solely as evidence of Appellant's intent, motive, and absence of mistake. As the trial court did not abuse its discretion in admitting the challenged evidence, this assignment of error is denied.

### *FIRST STAGE JURY INSTRUCTIONS*

¶ 100 In his fourth assignment of error, Appellant contends the trial court erred in failing to give his requested instruction on the "85% Rule". The record reflects that at the close of first stage evidence, the defense submitted a written instruction requesting the jury be advised of the "85% Rule", which the trial court refused. During subsequent deliberations, the jury sent out a note containing two questions. To the first question, "are the years in prison to be served back to back, or concurrently?" the court responded, "this is not for your consideration". To the second question, "can you impose a set number of years other than life sentence, such as 99 years?" the court responded, "yes, with the following explanation. A. If there is a maximum number of years

stated for the crime in your instructions, you may not exceed that maximum. B. There is no limit on the number of years you may impose if the maximum sentence is life".[19] The answers were not met with objections, and defense counsel even assisted in rewording the second response. Appellant now argues the absence of the instruction on the 85% Rule caused inflated sentences on the non-capital convictions and tipped the scales in favor of finding Appellant guilty of First Degree Murder.

¶ 101 Four crimes for which Appellant was convicted were subject to the 85% Rule— First Degree Murder, Second Degree Murder, First Degree Burglary, and Shooting with Intent to Kill. *See* 21 O.S.2001, § 12.1 and 21 O.S. Supp.2005, §§ 13.1(1),(2), (5) & (12). This Court has held the failure to give an instruction on the 85% Rule when applicable is subject to harmless error review. *Carter,* 2006 OK CR 42 at ¶ 5, 147 P.3d at 244.

¶ 102 Contrary to Appellant's argument, the first question posed by the jury, regarding running sentences concurrently or consecutively, is not necessarily an indication that the jury wanted to ensure that Appellant never got out of jail. It often reflects the jury's desire to know how sentences imposed in multiple counts will be served. As for the jury's second question, the jury was presented with numerous sentencing options on the non-capital counts. Three of the non-capital counts had an express maximum number of years listed in the sentencing range. A life sentence was listed as the maximum sentence for a conviction for shooting with intent to kill and second degree murder. The punishment instructions on those two offenses did not state there was no limit to the number of years the jury could recommend in lieu of a life sentence. In light of the potentially confusing nature of the numerous punishment instructions, the jury's question is not necessarily an indication of prejudice as a result of the absence of an 85% instruction.

¶ 103 Here, the record shows the jury recommended severe and in some counts, the maximum sentence, based upon the strong

19. (Tr. Vol. 9, pgs. 1733–35).

evidence of Appellant's guilt. Appellant's failure to raise a challenge to the sufficiency of the evidence supporting the convictions only bolsters the conclusion the jury recommended the sentences based upon the largely undisputed evidence. The sufficiency of the evidence supporting the sentences makes it clear the jury did not merely "round up" its sentences in an attempt to account for their uninformed guesses about the impact of parole, one of the main purposes articulated in *Anderson* for giving an 85% instruction. 2006 OK CR 6 at ¶ 23, 130 P.3d at 282.

¶ 104 In his fifth assignment of error, Appellant contends the trial court gave an erroneous instruction on second-degree murder by imminently dangerous conduct. Appellant asserts that had the jury been properly instructed, the jury likely would have convicted him of this lesser offense in the death of Mr. Cantrell.

¶ 105 The instruction requested by Appellant set forth as the fifth element of the offense, "the conduct is not done with the intention of taking the life of any particular individual". However, in the instruction actually given to the jury the fifth element read, "the conduct is not done with the intention of taking the life of or harming any particular individual." In *Willingham v. State*, 1997 OK CR 62, ¶ 24, 947 P.2d 1074, 1081, *overruled on other grounds in Shrum v. State*, 1999 OK CR 41, ¶ 10, 991 P.2d 1032, 1036, this Court held the phrase "or harming" should be excised from the uniform instruction reasoning "the existence of an intent to harm a particular individual should not preclude a conviction under section 701.8, because an intent to harm or injure can prove that the conduct was imminently dangerous to another person or that the accused was acting with a depraved mind". *Id.*, 1997 OK CR 62, at ¶ 25, 947 P.2d at 1081.

¶ 106 The jury in this case was not instructed on the current law of second-degree murder by imminently dangerous conduct. Despite Appellant's requested instruction, when the instructions were actually given to the jury no objection was raised to the improper instruction. Therefore, we review only for plain error. *Simpson v. State*, 1994 OK CR 40, ¶ 2, 876 P.2d 690, 693 ("failure to object with specificity to errors alleged to have occurred at trial, thus giving the trial court an opportunity to cure the error during the course of trial, waives that error for appellate review. . . .").

¶ 107 Misinstruction of the jury is subject to harmless error review. *Carter*, 2006 OK CR 42 at ¶ 5, 147 P.3d at 244. *See also Ellis v. Ward*, 2000 OK CR 18 ¶ 4, 13 P.3d 985, 986 ("even where error is committed, reversal is not required unless such error results in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right"). In addition to instructions on first degree murder in both Counts I and II, the jury was also instructed on second degree felony murder. Appellant challenges the viability of the second degree felony murder instruction in Count I arguing the State failed to prove the underlying felony of second degree burglary.

¶ 108 The record reflects that to both Counts I and II, the jury was instructed on first degree malice aforethought murder, second degree felony murder, and second degree murder by imminently dangerous conduct. The jury was clearly able to understand and apply the instructions as they found Appellant's culpability was the not the same in the two murders. That the jury returned a verdict for second-degree felony murder as to Count I, the murder of Mrs. Cantrell, shows that offense was an available option for first-degree malice aforethought murder. If the jury had believed Appellant's statements that he did not intend to kill Mr. Cantrell, they could have found Mr. Cantrell's murder occurred during the course of a burglary, as they found with Mrs. Cantrell's murder. The jury's first degree malice murder verdict in Count II, and by implication rejection of the second degree felony murder alternative, and the second degree felony murder verdict in Count I, demonstrates the misinstruction of the jury was not outcome determinative and the jury would not have convicted Appellant of second degree felony murder in Count II if properly instructed.

¶ 109 The viability of second degree felony murder as an alternative to a finding of first

degree malice murder in Count II satisfies the requirement of *Schad v. Arizona,* 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) and *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) that, when supported by the evidence, the jury must be given the option of convicting the defendant of a non-capital offense. *See Williams,* 2001 OK CR 9, at ¶ 31, 22 P.3d at 713–714. Accordingly, we find the misinstruction of the jury harmless beyond a reasonable doubt, and this assignment of error is denied.

¶ 110 In his sixth assignment of error, Appellant finds error in the trial court's failure to instruct the jury on first-degree heat of passion manslaughter. We review only for plain error as Appellant neither requested such an instruction nor objected to its absence. *Pickens v. State,* 2001 OK CR 3, ¶ 32, 19 P.3d 866, 878.

¶ 111 The determination of which instructions shall be given to the jury is a matter within the discretion of the trial court. *Cipriano v. State,* 2001 OK CR 25, ¶ 14, 32 P.3d 869, 873. Absent an abuse of that discretion, this Court will not interfere with the trial court's judgment if the instructions as a whole, accurately state the applicable law. *Id.* All lesser forms of homicide are necessarily included and instructions on lesser forms of homicide should be administered if they are supported by the evidence. *Id.* In determining the sufficiency of the evidence to support a lesser offense we look at whether the evidence might allow a jury to acquit the defendant of the greater offense and convict him of the lesser. *Id., citing Hogan v. Gibson,* 197 F.3d 1297, 1305 (10thCir.1999). *See also McHam v. State,* 2005 OK CR 28, ¶ 21, 126 P.3d 662, 670. Appellant's statements concerning the homicide are sufficient to warrant a jury instruction only if those statements are supported by other evidence presented at trial. *Cipriano,* 2001 OK CR 25 at ¶ 14, 32 P.3d at 873–874 citing *Newsted v. Gibson,* 158 F.3d 1085, 1092 (10th Cir.1998).

¶ 112 A homicide is first degree manslaughter "[w]hen perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner,

or by means of a dangerous weapon...." 21 O.S.2001, § 711(2). The evidence must "reasonably suggest that [the accused] committed the murder in the heat of passion and without an intent to kill." *Charm v. State,* 1996 OK CR 40, ¶ 8, 924 P.2d 754, 760. The "passion" necessary to support a manslaughter instruction must be so great as to "render the mind incapable of forming a design to effect death...." *Id.* The elements of heat of passion are 1) adequate provocation; 2) a passion or emotion such as fear, terror, anger, rage or resentment; 3) homicide occurred while the passion still existed and before a reasonable opportunity for the passion to cool; and 4) a causal connection between the provocation, passion and homicide. *Id.* The question is whether, in addition to evidence of intent, there was evidence that Appellant killed the deceased with adequate provocation, in a heat of passion, without the design to effect death. *Cipriano,* 2001 OK CR 25 at ¶ 14, 32 P.3d at 874.

¶ 113 In support of his argument, Appellant directs us to statements he made to Texas authorities that he continued to hit Mr. Cantrell with the butt of the gun, after the initial blow, because Mr. Cantrell kept attempting to get up. Appellant said he finally succeeded in knocking Mr. Cantrell unconscious but assumed he was not fatally injured since his breathing was audible. Appellant told the authorities that when he hit Mr. Cantrell in the head with the gun it was just to "knock him out" and "I wasn't trying to kill him". Appellant admitted in hindsight he hit Mr. Cantrell too hard. He said he didn't mean to hit him so hard but things had just gotten out of control.

¶ 114 In Appellant's videotaped statement, he told police he leaned the shotgun against the kitchen table and walked toward Mrs. Cantrell, Mr. Cantrell grabbed the shotgun and fired a shot, which accidentally hit Mrs. Cantrell in the back. Appellant claimed several of the shotgun pellets from that blast struck his right hand. Appellant said that at that point, he grabbed the gun with both hands and screamed at Mr. Cantrell asking why he fired. Appellant said that he and Mr. Cantrell struggled for the gun, and that

he used his superior strength to shove the butt of the shotgun into the left side of Mr. Cantrell's face. Appellant asserts these statements show he did not intend to kill Mr. Cantrell, he was provoked by the victim, and that he was acting under the influence of passion or emotion when he struck Mr. Cantrell. Appellant further argues there was a causal connection between the provocation, passion and homicide and he was about to leave the Cantrell home when Mr. Cantrell unexpectedly grabbed the shotgun and fired.

¶ 115 Even if we were to assume Appellant's statements were an accurate reflection of what transpired in the Cantrell home, he has not established the existence of sufficient provocation to warrant a heat of passion instruction.[20] Appellant's statements show he instigated the entire incident when he broke into the Cantrells' residence and held Mr. and Mrs. Cantrell hostage at gunpoint. If in fact, Mr. Cantrell grabbed the shotgun, it could reasonably be inferred he was attempting to defend himself and his wife. Appellant even admitted to Creek County investigators he understood Mr. Cantrell was trying to protect his wife. Appellant is not entitled to a heat of passion manslaughter instruction because the victim attempted to defend himself and protect his wife. *See Young v. State,* 2000 OK CR 17, ¶ 60, 12 P.3d 20, 39; *Washington v. State,* 1999 OK CR 22, ¶ 13, 989 P.2d 960, 968–969. Further, the fact that Mr. Cantrell may have physically struggled with Appellant for control of the shotgun is not sufficient to establish sufficient provocation in light of Appellant's admitted "superior strength" and the victim's poor health and physical disability.[21] On the basis of the evidence, including Appellant's statement, the trial court did not abuse its discretion in failing to give an instruction on heat of passion manslaughter.[22] This assignment of error is denied.

20. Under OUJI–Cr (2d) 4–98, adequate provocation is defined in part as "any **improper conduct** of the deceased toward the defendant(s) which naturally or reasonably would have the effect of arousing a sudden heat of passion within a reasonable person in the position of the defendant(s)".... Personal violence or aggression by the deceased of a nature sufficiently violent to cause or threaten to cause pain, bloodshed, or bodily harm to the defendant may be adequate provocation. *See* OUJI–CR (2d) 4–98. (emphasis added).

21. Dr. Danny Smith, the Cantrells' personal physician, testified that Mr. Cantrell suffered from "end-stage chronic obstructive pulmonary disease", a lung disease which affected Mr. Cantrell's breathing. Dr. Smith said that as a result of the disease, Mr. Cantrell "could not walk across this courtroom without getting in real distress". (Tr. Vol. 5, pg. 1099). Dr. Smith also testified that Mr. Cantrell suffered from anxiety related problems, which contributed to his respiratory stress. Additionally, Mr. Cantrell suffered from a rotator cuff injury to his shoulder, which prevented him from moving his shoulder upward or outward. Dr. Smith testified that if Mr. Cantrell fell to the floor, he would not be able to use his hands and knees to push himself up and the only way he could hold a shotgun would be at waist level. Dr. Smith said Mr. Cantrell would not be able to raise the shotgun to his shoulder.

22. Appellant's reliance on *Tarter v. State,* 1961 OK CR 18, 359 P.2d 596 and *Provo v. State,* 1976 OK CR 95, 549 P.2d 354 are not persuasive. In *Tarter,* this Court found the trial court's failure to give a heat of passion manslaughter instruction fundamental error. The Court found that by the "State's own witnesses premeditated design to kill may have been lacking in this case, and that the killing was in a heat of passion in a cruel and unusual manner, by means of a dangerous weapon". 1961 OK CR 18, at ¶ 32, 359 P.2d at 600. The Court ruled that "where the evidence as here creates a reasonable doubt that the killing was committed with premeditated design to effect death, the proper exercise of discretion should direct the giving of an instruction on manslaughter". 1961 OK CR 18, at ¶ 37, 359 P.2d at 601. In the present case, neither the State's evidence nor Appellant's own statements supported an instruction on heat of passion manslaughter.

The Court also reversed the conviction in *Provo* due to the lack of an instruction on first-degree manslaughter. The Court found the defendant's statements that he did not intend to kill the victim (that he only intended to rob him) and that he hoped the victim lived, combined with evidence that the weapon used was a wooden club with a metal cap (used to beat the victim unconscious), and that the victim's prior medical conditions (heart and lung disease as well as coronary arteriosclerosis), resulted in complications contributing to his death four days after attacked by the defendant, warranted a manslaughter instruction. 1976 OK CR 95 at ¶ 5, 549 P.2d at 357. In its decision, the Court did not address the elements of heat of passion manslaughter but simply found "the evidence creat[ed] a reasonable doubt that the killing was committed with premeditated design to effect death, the proper exercise of discretion should direct the giving of an instruction on manslaughter." 1976 OK CR 95, at ¶ 6, 549 P.2d at 358. In the present case, if believed, Appellant's state-

¶ 116 In his seventh assignment of error, Appellant contends the trial court erred in failing to *sua sponte* instruct the jury in Count IV on the lesser included offense of Assault and Battery with a Dangerous Weapon. In light of Appellant's failure to request the instruction at trial, our review is for plain error only. *Pickens,* 2001 OK CR 3, at ¶ 32, 19 P.3d at 878.

¶ 117 Appellant argues his statements to the authorities that he did not intend to kill Tyler Montgomery supported the instruction on the lesser offense. Specifically he directs us to statements that when he entered the Wright residence, he told Montgomery not to move and that he didn't want to chase him so he shot at him to prevent him from running away. Appellant told police he intended to hit Montgomery in the "ass or legs" and was surprised when told by investigators that he had actually struck Montgomery in the back. Appellant also claimed that his actions while riding in the back of Montgomery's truck were merely efforts to grab Montgomery and get him to stop the truck.

¶ 118 The crime of assault and battery with a dangerous weapon is committed with the intent to harm or injure, not kill, another person. *Favro v. State,* 1988 OK CR 18, ¶ 5, 749 P.2d 127, 130; *Meggett v. State,* 1979 OK CR 89, ¶ 10, 599 P.2d 1110, 1114. *See also* 21 O.S.2001, § 645.

¶ 119 Appellant's description of the attack upon Tyler Montgomery must be viewed in light of the other evidence offered at trial. Montgomery testified that when he first saw Appellant through the glass front door, he jumped up and ran because Appellant had an angry look on his face and he was carrying a shotgun. Montgomery testified Appellant fired immediately upon opening the front door of the residence and did not say anything before or after firing the shotgun. Both Montgomery and Appellant said Montgomery was shot in the back from a distance of eight (8) to ten (10) feet. Despite Appellant's claim that he shot without intending to

kill Montgomery, his firing directly at the victim in the confines of the small house, with at best, issuing a lone warning of "don't move" does not support an inference that Appellant did not shoot with the intent to kill the victim. Appellant's actions certainly do not support an inference that Appellant was merely trying to prevent Montgomery from running away.

¶ 120 Further, Montgomery testified the shot forced him to the floor where Appellant stepped over him to go into the kitchen. With great difficulty, Montgomery got up and eventually got out of the house and into his pickup. Montgomery testified that Appellant chased him out of the house and jumped into the bed of the pickup. Montgomery said that as he drove away from the scene, he could see Appellant re-loading his shotgun. Appellant fired a second shot through the truck's rear windshield, which hit Montgomery in the back. Although Montgomery's erratic driving, an attempt to throw Appellant out of the truck, could have affected Appellant's aim, his firing in the victim's direction instead of away from him suggests Appellant intended to do more than merely get Montgomery's attention so he would stop the truck.

¶ 121 Appellant's statement to police that he "never got to reload the third . . . because he bounced the crap out of me . . ." suggests Appellant intended to re-loaded the weapon for a third shot at the victim but was prevented from doing do by the victim's driving. Montgomery testified that after the crash, he saw Appellant reach into his coat pocket where he kept the shotgun shells as if he were trying to re-load the shotgun. As a result of the two gunshot wounds received from Appellant, Montgomery endured six to seven surgeries to repair the damage, and was kept on a ventilator after having had a lung re-inflated. Appellant's armed pursuit of Montgomery clearly infers he intended to do more than merely injure the victim.

¶ 122 Appellant's statements that he shot Montgomery with only the intent to injure

ments created a reasonable doubt that the killings were premeditated and that they were the result of his imminently dangerous conduct (second degree murder) or that they occurred during

Appellant's commission of a burglary (second degree felony murder). Unlike *Provo,* the evidence did not support a first degree manslaughter instruction.

him are inconsistent and contradictory to other evidence presented at trial. Therefore, his statements are not sufficient to warrant an instruction on assault and battery with a dangerous weapon. When Appellant's statements are viewed in context of the other evidence at trial, the record simply does not support an instruction on the lesser offense. Even if such an instruction had been given, under the evidence in this case, a rational jury would not have acquitted Appellant of Shooting with Intent to Kill and returned a verdict for Assault and Battery with a Dangerous Weapon. Appellant's conduct was much more serious and violent for the jury to return a verdict on the lesser offense. Accordingly, the trial court did not abuse its discretion in failing to give a jury instruction on assault and battery with a dangerous weapon in Count IV.

### SECOND STAGE ISSUES

¶ 123 In his ninth assignment of error, Appellant challenges the sufficiency of the evidence supporting the aggravating circumstance that he "knowingly created a great risk of death to more than one person." [23] In order to determine whether the State has met its burden in proving an aggravating circumstance, this Court reviews the record in the light most favorable to the State to determine whether any rational trier of fact could have found the facts necessary to support the aggravating circumstance beyond a reasonable doubt. *Warner,* 2006 OK CR 40 at ¶ 122, 144 P.3d at 878. The aggravating circumstance of "creating a great risk of death is proved by a defendant's acts which create a risk of death to another in close proximity, in terms of time, location, and intent to the killing." *Ryder v. State,* 2004 OK CR 2, ¶ 77, 83 P.3d 856, 874. "The rationale behind [the great risk of death] aggravator is that, by its very language, there must be a risk of death, that risk must be to more than one person, it must be great, and the defendant must know that risk exists." *Jackson v. State,* 2006 OK CR 45, ¶ 41, 146 P.3d 1149, 1163–64.

¶ 124 Appellant argues the State failed to establish "two qualifying restrictions"—that it was Appellant who killed Mrs. Cantrell and that her death was in close proximity to Mr. Cantrell's death in terms of intent as Appellant did not intend to kill or even harm Mrs. Cantrell. To support this argument, Appellant relies on the jury's verdict of the lesser offense of second degree felony murder as to Mrs. Cantrell's death and contends that the only inference to be drawn from the verdict is that the jury concluded that Mrs. Cantrell was accidentally shot by her husband and necessarily pre-deceased him.

¶ 125 It is not the death of more than one person that satisfies this aggravator, but the acts of a defendant that create a great risk of death to at least one other person who is near to the homicide. *Jackson,* 2006 OK CR 45 at ¶ 43, 146 P.3d at 1163–64. In fact the death of a person other than the homicide victim is not a prerequisite for a finding of this aggravator. *See Jones v. State,* 2006 OK CR 5, ¶ 102, 128 P.3d 521, 550; *Harris,* 2004 OK CR 1 at ¶ 53, 84 P.3d at 751; *Salazar v. State,* 1996 OK CR 25, ¶ 8, 919 P.2d 1120, 1123; *Snow v. State,* 1994 OK CR 39, ¶ 24, 876 P.2d 291, 297. The gravamen of the circumstance is not the number of persons killed, but the callous creation of the risk to more than one person. *Ryder,* 2004 OK CR 2 at ¶ 77, 83 P.3d at 874.

¶ 126 By illegally entering the Cantrells' home and holding the couple hostage at gunpoint, Appellant callously created a great risk of death to both individuals. Contrary to Appellant's argument that the second-degree felony murder verdict showed Appellant did not kill Mrs. Cantrell, the verdict clearly showed the jury found Mrs. Cantrell's death was the result of criminal conduct by Appellant. Although the jury may have believed Appellant's statement that he did not fire the shot that hit Mrs. Cantrell, the jury certainly believed he was responsible for her death.

¶ 127 The second-degree felony murder verdict does not necessarily resolve the issue of who died first. Although Appellant claimed Mrs. Cantrell died first, when the bodies were discovered, her body was on top

---

**23.** 21 O.S.2001, § 701.12(2).

of husband's, inferring she died last. As we have seen throughout this case, the jury acted well within their authority in choosing to believe parts of Appellant's statements while disbelieving others.

¶ 128 Appellant points out that during closing argument, the prosecutor admitted the Mrs. Cantrell died first. However, reading his comments in context, such an admission was made for purposes of argument only and to support the finding of a predicate crime necessary for the alleged, but not found, aggravator that the murder was committed to avoid lawful arrest or prosecution.[24] What this record shows is that the prosecutor's comments were properly regarded by the jury as argument, not evidence, and cannot be relied upon to find that the second degree felony murder verdict meant Mrs. Cantrell died first and therefore could not be at risk when her husband was killed.

¶ 129 Here the evidence was sufficient to show that Appellant knowingly created a great risk of death to both Mr. and Mrs. Cantrell by holding them hostage at gunpoint. *See Smith v. State,* 1986 OK CR 158, ¶ 31, 727 P.2d 1366, 1373 (aggravator supported "where a defendant during the continuing course of conduct in which a murder is committed, threatens the life of another and has the apparent ability and means of taking that person's life").

¶ 130 The State also argued at trial that Appellant's attacks on Tyler Montgomery and Carla Wright, occurring after the Cantrell murders and across the street, satisfied this aggravator. However, while we find legal and factual support for that finding, we do not need to address that issue at this time as we find the aggravator sufficiently established by Appellant's criminal conduct toward Mrs. Cantrell.

¶ 131 Appellant next argues the prosecutor "materially misled the jury" about the proof necessary to establish the great risk of death aggravator. Appellant asserts the prosecutor told the jury that by their first stage verdicts the jury had decided the aggravator had been proven and that when two people are dead, the aggravator is automatically proven. Neither of the two comments now challenged were met with contemporaneous objections, therefore we review only for plain error. *Bland,* 2000 OK CR 11 at ¶ 89, 4 P.3d at 726.

¶ 132 Reading the first challenged comment in context, the prosecutor stated during the first part of his closing argument:

> You'll hear testimony about the next aggravating circumstance, that of knowingly creating a great risk of death to more than one person. You'll hear no extra testimony in second stage on that. You've already found that through your verdicts Patsy was killed, Tyler was shot twice, Carla was attacked. It was all part of the same transaction and occurrence, the same time, the same place, practically.

> Of great risk to more than one person, more than one person. You've heard the testimony about the two dead bodies and the injuries to folks across the street. You've convicted the defendant of all of those crimes. Risk of death to more than one person.[25]

¶ 133 These were permissible comments on the evidence and the inferences to be drawn therefrom. *Id.,* 2000 OK CR 11 at ¶ 97, 4 P.3d at 728. The prosecutor clearly did not tell the jury the first stage verdicts had proven the aggravator.

24. The prosecutor stated in part, "I am going to assume, and don't let me put words in your mouth, but by the verdict of second degree murder for Patsy Cantrell that you have found as truth that her death was caused by a struggle over the gun by Cantrell shooting her during a struggle with the defendant or for whatever purpose. If that is the case, the reasonable inference for that is that she died first. That would be a predicate crime." (Tr. Vol. 11, pg. 2187).

In support of the "especially heinous, atrocious or cruel aggravator," the prosecutor stated in part; "I want you to recall the testimony and the statements of the defendant, that if we are to believe the defendant, and we hear your verdict of murder in the second degree, that A.J. must have witnessed the death of his wife in the last moments of his own, his wife of 53 years." (Tr. Vol., 10, pg. 1754). We can say with reasonable certainty, this statement did not affect the jury's finding of the aggravator as it was supported by sufficient evidence. See Proposition XI.

25. (Tr. Vol. 10, pgs. 1755–1756).

¶ 134 In the second comment now challenged the prosecutor stated:

Let me move on to risk to more than one person. Another, quote, unquote, easy one to look at. You know what the evidence is in this case. You know the two people that have been dead. You've already convicted him of two murders. That's almost what we in the law call ipso factos. Just automatically proves danger to more than one person.[26]

¶ 135 On its face, the comment may seem unfairly prejudicial. However, the prosecutor did not state that the aggravator was automatically proven, but that danger to more than one person was proven. Further, after this comment, the prosecutor reviewed the evidence of Appellant's crime spree in Depew and argued the totality of his criminal actions and the people he endangered supported the aggravator. Any misstatements by the prosecutor were not so egregious as to have denied Appellant a fair trial or to have affected the outcome of the trial. *Id.*, 2000 OK CR 11 at ¶ 90, 4 P.3d at 726.

¶ 136 Finally, Appellant argues that a more specific instruction on the aggravator should have been given. In Instruction No. B–7, the jury was informed:

You are instructed that, in arriving at your determination of punishment, you must first determine whether any one or more of the following aggravating circumstances exists beyond a reasonable doubt:

1. During the commission of the murder, the defendant knowingly created a great risk of death to more than one person;

2. The murder was especially heinous, atrocious, or cruel;

3. The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution

4. At the present time there exists a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society.[27]

¶ 137 Additional uniform instructions were given for each of the alleged aggravators except for great risk of death. Appellant neither objected to the instruction given nor requested additional or modified instructions. Appellant now argues on appeal that a specific uniform instruction addressing only the great risk of death aggravator is necessary and that without such, the jury in his case was unable to appropriately apply the evidence to the law.

¶ 138 Much of Appellant's argument focuses on the sufficiency of the evidence supporting the aggravator. As addressed above, the evidence was sufficient to allow a reasonable trier of fact to find beyond a reasonable doubt that Appellant knowingly created a great risk of death to more than one person.

¶ 139 We have previously rejected requests to more specifically define the aggravator, finding the statutory language "readily understandable", *Smith*, 1986 OK CR 158 at ¶ 29, 727 P.2d at 1373 and "clear and subject to objective review". *Knighton,* 1996 OK CR 2 at ¶ 70, 912 P.2d at 895. Further, we have consistently rejected argument that the statutory language is constitutionally vague or overbroad. *Matthews v. State*, 2002 OK CR 16, ¶ 47, 45 P.3d 907, 922; *Selsor v. State,* 2000 OK CR 9, ¶ 29, 2 P.3d 344, 353, *Hammon v. State*, 2000 OK CR 7, ¶ 39, 999 P.2d 1082, 1092; *Snow*, 1994 OK CR 39 at ¶ 23, 876 P.2d at 297; *Trice v. State*, 1993 OK CR 19, ¶ 58, 853 P.2d 203, 220. Appellant's challenges to the instruction are not persuasive and we find the instruction given sufficient to fully inform the jury on the aggravator. Accordingly, this assignment of error is denied.

¶ 140 In his tenth assignment of error, Appellant challenges the "especially heinous, atrocious or cruel" aggravator.[28] To prove this aggravator, the State must show that the murder of the victim was preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty. *Warner*, 2006 OK CR 40 at ¶ 129, 144 P.3d at 880. Serious physical abuse requires evidence of conscious physical suffering. *Id.* This includes evidence which shows the inflic-

---

**26.** (Tr. Vol. 12, pg. 2188).

**27.** (O.R. 1042, OUJI–Cr (2d) 4–72).

**28.** 21 O.S.2001, § 701.12(4).

tion of either great physical anguish or extreme mental cruelty. *Id.* After making the above determination, the attitude of the killer and the pitiless nature of the crime can also be considered. *Gilson v. State*, 2000 OK CR 14, ¶ 153, 8 P.3d 883, 924. Appellant argues the evidence was insufficient to prove Mr. Cantrell consciously suffered prior to his death.

¶ 141 Appellant told the authorities he hit Mr. Cantrell on his left side with the butt of the shotgun, causing Mr. Cantrell to fall backwards onto a table containing glass knickknacks. Mr. Cantrell got to his knees and started to get up when Appellant hit him again with the butt of the shotgun. After being knocked down, Mr. Cantrell again tried to get up when Appellant hit him in the back of the head with the butt of the shotgun. Appellant said he continued to hit Mr. Cantrell in the back of the head until he stopped attempting to get up. Appellant said Mr. Cantrell was breathing when he dragged his body into the bathroom and he heard him "kind of gagging" when Appellant tried to sit him up in the bathroom.

¶ 142 Dr. Ronald Distefano, the medical examiner testified he found multiple injuries to Mr. Cantrell's head, consisting of five distinct areas of lacerations and abrasions. The injuries included actual injury to Mr. Cantrell's brain surface and a skull fracture. He testified the five distinct areas were caused by an object forcefully striking the head and that it would have required a great deal of force to inflict the injuries. Dr. Distefano said any of the five injuries had the potential to result in unconsciousness and he could not specifically determine which of the five injuries occurred first. He also stated that a single blow might not necessarily cause unconsciousness and if the victim continued to respond after being struck, that would be an indication of consciousness.

¶ 143 Appellant argues that two other "senior citizens" were beaten in the head with a gun and testified that because of the adrenaline rush, they felt no pain. Therefore, Mr. Cantrell probably did not feel any pain. Neither Mrs. Wright nor Dr. Peebles suffered the extent of injuries inflicted upon Mr. Cantrell nor did they suffer from chronic medical conditions, as did Mr. Cantrell. Just because Mrs. Wright and Dr. Peebles testified they felt no pain as result of their injuries, does not mean Mr. Cantrell didn't feel any pain. Mr. Cantrell was a chronically ill 77-year-old man with limited mobility engaged in a fight for his life with Appellant. Dr. Smith, the Cantrells' personal physician, contradicted Appellant's account of the struggle with Mr. Cantrell as he testified Mr. Cantrell was physically unable to get to his hands and knees after falling to the floor. The repeated beatings with a shotgun endured by Mr. Cantrell and his determined resistance were sufficient to establish his conscious physical suffering at the hands of Appellant. Reviewing the evidence in the light most favorable to the State, we find a rational trier of fact could have found the facts necessary to support the aggravating circumstance of heinous, atrocious or cruel beyond a reasonable doubt. Accordingly, this assignment of error is denied.

¶ 144 In his eleventh proposition of error, Appellant repeats his challenges to the sufficiency of the evidence supporting the two aggravating circumstances. He argues that if this Court concludes he was properly convicted of an aggravated murder and therefore eligible for the death sentence, this Court should vacate the death sentence because the aggravating factors did not outweigh the mitigating circumstances.

¶ 145 We consider this argument in conjunction with our mandatory sentence review. Pursuant to 21 O.S.2001, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.2001, § 701.12. We determined in Propositions Nine and Ten that sufficient evidence supported the great risk of death and especially heinous, atrocious, and cruel aggravating circumstances.

¶ 146 In mitigation, Appellant presented eleven witnesses who testified that that he was under the influence of mental or emotional disturbances that affected his judg-

ment leading up to the crime; he acted impulsively without planning; he accepted responsibility for his acts and confessed to authorities almost immediately after being arrested; he cooperated with authorities and lead them to evidence they might not otherwise have discovered; and is 44 years old and not likely to commit acts of violence if confined to a prison setting.

¶ 147 Appellant also presented evidence that his biological mother abused drugs and alcohol, and likely engaged in this abuse while pregnant with Appellant; his mother was in a tenuous emotional state during his infancy and committed suicide before he was nine months old; after his mother's suicide, he was cared for by his eight year old sister and an alcoholic and neglectful relative until his father remarried when Appellant was three years old; his father drank heavily and was emotionally detached and withdrawn from Appellant and his sister; Appellant was very close to his stepmother, Dorothy, and was devastated when she died of cirrhosis when Appellant was 15 years old; and the combined effects of Appellant's early life severely affected his psychological and emotional development.

¶ 148 Other evidence showed he was a hardworking and responsible member of society before events in his life began to deteriorate; he was a good and loving father whose daughter still loves him and misses him very much; and Appellant has technical skills and aptitude that could be put to good use in the prison system. This mitigating evidence was set forth in jury Instruction No. B–13, along with the directive that the jury could decide that other mitigating circumstances exist, and if so, they should consider those circumstances as well.

¶ 149 "Specific standards for balancing aggravating and mitigating circumstances are not constitutionally required."

*Romano v. State*, 1993 OK CR 8, ¶ 111, 847 P.2d 368, 392, *citing Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The "beyond a reasonable doubt" burden of proof analysis is not strictly applicable to the weighing process of the second stage. *Id.*, 1993 OK CR 8 at ¶ 112, 847 P.2d at 392. "While the State must prove beyond a reasonable doubt the existence of at least one of the enumerated aggravating circumstances, the determination of the weight to be accorded the aggravating and mitigating circumstances is not a fact which must be proved beyond a reasonable doubt. Instead, it is a balancing process." *Id. citing Johnson v. State*, 1987 OK CR 8, ¶ 44, 731 P.2d 993, 1005.

¶ 150 We have carefully reviewed and weighed the evidence supporting the aggravating circumstances, as well as the evidence offered in mitigation. We find that under the facts of this case the evidence in aggravation outweighed the evidence in mitigation.[29] Appellant correctly asserts that the United States Supreme Court has interpreted the Eighth Amendment to the federal constitution to mean that the death penalty may only be imposed upon those few murderers who are deemed the "worst of the worst murderers", citing *Cheney v. State*, 1995 OK CR 72, ¶ 9, 909 P.2d 74, 78. He argues that he "is hardly the worst of the worst" and that the death penalty is not warranted in this case. To the contrary, the evidence clearly shows Appellant is indeed one of the "worst of the worst" and the death penalty is appropriate in this case. This assignment of error is denied.

### CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 151 In his twelfth assignment of error, Appellant challenges trial counsels' ef-

---

**29.** *Ullery v. State*, 1999 OK CR 36, ¶ 46, 988 P.2d 332, 352–353 and *Malone v. State*, 1994 OK CR 43, ¶ 40, 876 P.2d 707, 718, relied upon by Appellant, are distinguishable from the present case. In *Ullery*, the jury found the existence of only one aggravating circumstance. On appellate review, this Court found the mitigating evidence outweighed the evidence of the single aggravator. In *Malone*, the jury found the exis-

tence of two aggravators. On appellate review, this Court found only one of those aggravator supported by sufficient evidence. Pursuant to our authority to reweigh the evidence when an aggravator falls, this Court found the mitigating evidence outweighed the remaining aggravating circumstance. In the present case, both aggravators found by the jury were supported by sufficient evidence.

fectiveness in both the first and second stages of trial. An analysis of an ineffective assistance of counsel claim begins with the presumption that trial counsel was competent to provide the guiding hand that the accused needed, and therefore the burden is on the accused to demonstrate both a deficient performance and resulting prejudice. *Bland,* 2000 OK CR 11, at ¶ 112, 4 P.3d at 730–731 *citing Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) and *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). *Strickland* sets forth the two-part test which must be applied to determine whether a defendant has been denied effective assistance of counsel. *Id.* First, the defendant must show that counsel's performance was deficient, and second, he must show the deficient performance prejudiced the defense. *Id.* Unless the defendant makes both showings, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Id. quoting Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

¶ 152 Appellant must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. *Id.* The burden rests with Appellant to show that there is a reasonable probability that, but for any unprofessional errors by counsel, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id., citing Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070. The issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance. *Id.*

¶ 153 Appellant first alleges that trial counsel was ineffective for failing to properly preserve for appellate review a claim of error relating to the trial court's failure to excuse for cause Juror D.B. In Proposition I, above, we reviewed for plain error and found the trial court did not abuse its discretion in denying Appellant's for-cause challenge to Juror D.B. Thus, Appellant has failed to

show there is a reasonable probability that, but for counsel's omission, the result of the proceeding would have been different. *See Strickland,* 466 U.S. at 696, 104 S.Ct. at 2070 (when a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed).

¶ 154 Appellant next argues counsel was ineffective for failing to object to the wording of the jury instruction for second-degree murder by imminently dangerous conduct. As discussed in Proposition V, counsel requested the correct instruction but an incorrect statement of the law was included in the instruction actually given to the jury, apparently overlooked by court and counsel alike. However, we found the error created by the misinstruction to the jury was harmless beyond a reasonable doubt as the jury was sufficiently instructed on other non-capital lesser offenses. Therefore, Appellant has not shown that but for counsel's failure to object to the instruction actually given to the jury the result of his trial would have been different.

¶ 155 Appellant next directs us to Proposition VI where he asserts counsel was ineffective for failing to request a jury instruction on heat of passion manslaughter, and Proposition VII, where counsel failed to request a jury instruction on Assault and Battery with a Dangerous Weapon as a lesser offense of Shooting with Intent to Kill. As discussed previously in this opinion, the evidence did not warrant jury instructions on heat of passion manslaughter or assault and battery with a dangerous weapon. Any requests by defense counsel to give such instructions would have been overruled. Trial counsel will not be found ineffective for failing to raise objections which would have been overruled. *Phillips v. State,* 1999 OK CR 38, ¶ 104, 989 P.2d 1017, 1044.

¶ 156 Appellant next complains that trial counsel was ineffective for failing to object to the prosecutor's misstatement and in failing to request a clarifying instruction regarding the great risk of death aggravator. In Proposition IX, we found the jury was properly instructed under the statutory language of the aggravator, and that the prosecutor did not mislead the jury as to the legal require-

ments for the aggravator. Therefore, any objections by defense counsel would have been overruled.

¶ 157 Finally, Appellant refers us to his Application for Evidentiary Hearing on Sixth Amendment Grounds filed contemporaneously with his direct appeal. We review that separately below. Reviewing the allegations raised in the direct appeal brief, we have considered counsel's challenged conduct on the facts of the case as viewed at the time and find Appellant has failed to meet his burden of showing a reasonable probability that, but for any unprofessional errors by counsel, the result of the trial would have been different as any errors or omissions by counsel did not influence the jury's determination of guilt or decision to impose the death sentence. Accordingly, we find that Appellant was not denied effective assistance of counsel and this assignment of error is denied.

### ACCUMULATION OF ERROR CLAIM

¶ 158 In his eighteenth assignment of error, Appellant contends that, even if no individual error merits reversal, the cumulative effect of such errors warrants either reversal of his conviction or a modification of his sentence. A cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Warner*, 2006 OK CR 40 at ¶ 223, 144 P.3d at 896. However, when there have been numerous irregularities during the course of a trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors is to deny the defendant a fair trial. *Id.* While certain errors did occur in this case, even considered together, they were not so egregious or numerous as to have denied Appellant a fair trial. Therefore, no new trial or modification of sentence is warranted and this assignment of error is denied.

### APPLICATION FOR EVIDENTIARY HEARING ON SIXTH AMEND-MENT CLAIMS

¶ 159 Rule 3.11(B)(3)(6), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2001), allows an appellant to request an evidentiary hearing when it is alleged on appeal that trial counsel was ineffective for failing to "utilize available evidence which could have been made available during the course of trial...." Once an application has been properly submitted along with supporting affidavits, this Court reviews the application to see if it contains "sufficient evidence to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i).

¶ 160 Appellant asserts his application is related to Proposition VI from his appellate brief where he argued trial court error in failing to instruct the jury on heat of passion manslaughter. Appellant argues trial counsel was ineffective for failing to utilize available evidence which would have corroborated his statements that he was provoked by Mr. Cantrell's actions in grabbing the shotgun, accidentally shooting Mrs. Cantrell in the back and Appellant in the right hand, and that before his anger had time to cool, Appellant beat Mr. Cantrell with the shotgun. Appellant relies in part on OUJI–Cr (2d) 4–98 to argue that Mr. Cantrell's actions in shooting Appellant in the hand qualified as adequate provocation as it showed "personal violence or aggression by the deceased of a nature sufficiently violent to cause or threaten to cause pain, bloodshed, or bodily harm to the defendant".

¶ 161 Attached to Appellant's motion as Exhibit A is a signed affidavit from Barry J. Rouw, investigator for the Oklahoma Indigent Defense System (OIDS). Mr. Rouw states in part that in October 2005, while retrieving and transporting Appellant's files from the office of the Norman Capital Trial Division of OIDS to the Capital Direct Appeals Division, he found two documents, referred to as "Bates-stamped CDC 1120 and CDC 1121-222". These documents were copies of memos to the file prepared by Dale Anderson, Norman Capital Trial Division Investigator. The documents referred to herein were addressed to Appellant's team of

trial counsel. The documents are attached to Mr. Rouw's affidavit.

¶ 162 In the document marked CDC 1120, and dated January 29, 2004, Investigator Anderson states in pertinent part that he spoke to Captain James Galloway of the Angelina County Sheriff's Office, in Lufkin, Texas, who told him that he had taken photographs of Appellant's hand. Anderson states that Galloway said Appellant told him "that the old man shot him when the old man shot the woman and that it hit his hand". Captain Galloway said he thought he had the photographs and that they could be subpoenaed or obtained through the District Attorney. Galloway said he could not tell if the wounds were fresh, but there did look to be something wrong with Appellant's hand. Galloway said he could not tell "if BB's were the cause of the injury or how the wound occurred".

¶ 163 In the document marked CDC 1121, dated October 1, 2004, Investigator Anderson again referred to an interview with Captain Galloway. Anderson said that Galloway told him that he had taken photographs of Appellant's hand because Appellant told him he had injured it while in Oklahoma. Galloway said he would get the photos to the Creek County District Attorney's Office.

¶ 164 Exhibit B contains another signed affidavit by Mr. Rouw and states that the attached photos were contained in Appellant's OIDS file in a folder labeled "Eizember pictures from San Angelina County". Mr. Rouw states the photographs were "Bates-stamped" at the OIDS Capital Direct Appeals Division, "CDC 8502, CDC 8503, CDC 8505". The attached photos are color photographs showing a small round healing wound to Appellant's thumb, a small round healing wound in the middle of the back of the wrist, a slight scrape or healing wound between the

middle and lower joints of the index finger, and a similar wound between the same two joints of the right middle finger.

¶ 165 Setting aside questions we may have concerning the actual cause of Appellant's injuries, the evidence in this case, including Appellant's own statements, shows he was a burglar and home invader in the Cantrell residence.[30] Under 21 O.S.2001, § 1289.25(B), Mr. Cantrell was justified in using any degree of physical force, including but not limited to deadly force, against Appellant who had made an unlawful entry into his home. *See also State v. Anderson*, 1998 OK CR 67, ¶ 10, 972 P.2d 32, 36 (interpreting language of § 1289.25). Any force Mr. Cantrell may have used against Appellant was justified. "It would be ludicrous to consider the victim's justified actions as provocation for the appellant's illegal act". *Westley v. State*, 754 S.W.2d 224, 230 (Tx.Cr.App.1988).

¶ 166 Therefore, trial counsel's failure to use the photographs (whether intentional or not) does not convince us by clear and convincing evidence there is a strong possibility that defense counsel was ineffective for failing to utilize the evidence at trial.[31] Accordingly, we decline to grant Appellant's application for an evidentiary hearing.

### *MANDATORY SENTENCE REVIEW*

¶ 167 Pursuant to 21 O.S.2001, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.2001, § 701.12. Turning to the second portion of this mandate, the jury found the existence of two (2) aggravating circumstances: 1) Appellant knowingly created a great risk of death to more than one person; and 2) the murder

---

**30.** Based upon the evidence in this case, Appellant could have received his injuries through his struggle with Dr. Peebles. Additionally, the medical examiner testified that Mrs. Cantrell was shot at a relatively close range, approximately five to eight feet and that several of the birdshot pellets remained in her body. It is questionable whether the injuries reflected in the photographs submitted by Appellant could have been caused by birdshot pellets fired at close range.

**31.** As the photographs were found in the trial folder, it is not clear from the record or Appellant's motion whether trial counsel intentionally did not use the photographs as a matter of trial strategy or whether the photographs were merely overlooked.

was especially heinous, atrocious or cruel. 21 O.S.2001, § 701.12(2)(4). As discussed in Propositions 9 and 10, we found each of these aggravators was supported by sufficient evidence.

¶ 168 In proposition eleven we set out the mitigation evidence presented by Appellant. Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we found the aggravating circumstances outweighed the mitigating evidence. Therefore, the sentence of death is factually substantiated and appropriate.

¶ 169 Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.2001, § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence. Accordingly, finding no error warranting reversal or modification, the **JUDGMENTS** and **SENTENCES** are **AFFIRMED** and the **APPLICATION FOR EVIDENTIARY HEARING ON SIXTH AMENDMENT CLAIMS IS DENIED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2006), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, V.P.J.,: concur.

LEWIS, J.: concur in result.

CHAPEL, J. and A. JOHNSON, J.: concur in part/dissent in part.

CHAPEL, J., Concurring in Part and Dissenting in Part.

¶ 1 Eizember claims in Propositions I and II that his trial was tainted when biased jurors who sat on his jury should have been excused for cause. I agree. The constitution requires an unbiased jury. A juror cannot serve if his "views prevent or substantially impair the performance of his duties as a

juror in accordance with his instructions and his oath."[1] A capital juror must be able to fairly consider all three punishment options.[2] Biased jurors were allowed to serve on Eizember's trial, even though he requested they be removed for cause, and despite clear pretrial statements indicating their biases.

¶ 2 Before *voir dire,* prospective jurors in Eizember's case filled out extensive questionnaires. Use of juror questionnaires is often thought of as a time-saving measure, allowing the trial court to move swiftly past many standard questions and reducing the court time necessary to pick a jury. This is true, but juror questionnaires serve another, more important, substantive function. During a capital case *voir dire,* jurors are often asked questions on their feelings about crime, the criminal justice system and the death penalty. Many jurors have not had occasion to think about these issues, and some jurors are reluctant to answer the questions honestly aloud in public. Questionnaires allow jurors to honestly think about and answer these and other questions related to bias and their ability to consider all the evidence and the punishments in each case. A juror's answer on a questionnaire, given in private and after the leisure to think about the question and answer, is a good indicator of the juror's position on the question. For this reason, juror questionnaires are useful to initially cull from the panel jurors with an obvious bias or inability to discharge the duties of a juror.

¶ 3 Here, juror questionnaires showed a clear bias which made the jurors unfit for service. Rather than simply thank and excuse those jurors, the trial court made the effort to rehabilitate them. I might understand this if the juror pool were severely limited. However, the trial court had other potential jurors available. In a capital case the ability to consider punishment fairly is of the utmost importance. A juror's bias need not be proved with "unmistakable clarity" before he may be excused for cause.[3] When

1. *Rojem v. State,* 2006 OK CR 7, 130 P.3d 287, 295; *Warner v. State,* 2001 OK CR 11, 29 P.3d 569, 572; *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).

2. *Jones v. State,* 2006 OK CR 17, 134 P.3d 150, 155; *Hanson v. State,* 2003 OK CR 12, 72 P.3d 40, 48; *Warner,* 29 P.3d at 573.

3. *Rojem,* 130 P.3d at 295; *Warner,* 29 P.3d at 573; *Salazar v. State,* 1996 OK CR 25, 919 P.2d 1120, 1128.

faced with such dubious questionnaire answers, which are reinforced through questioning, why not take these answers as an honest reflection of the jurors' opinions, excuse them, and move on? The majority's opinion focuses on the jurors' answers during *voir dire,* and concludes that the jurors were sufficiently rehabilitated. As I explain below, I disagree with this analysis. Looking at the whole of *voir dire,* and taking the questionnaire answers with the *voir dire* transcript, these jurors consistently exhibited bias which rendered them unfit to serve.[4] However, I am more concerned that we have to engage in that analysis. The reversible juror error in this case could have been avoided by simply believing the potential jurors and excusing them from service. "[A]ll doubts regarding juror impartiality must be resolved in the defendant's favor."[5] The trial court failed to follow this simple maxim, and the majority's conclusion compounds this error.

¶ 4 Juror D.B. wrote, "I firmly believe if you take a life you should lose yours." She had no reservations about seeing a guilty person who had taken the life of another put to death. She believed the death penalty kept taxpayers from supporting a criminal for the rest of his life. She was strongly in favor of capital punishment and said it was definitely not used too often in Oklahoma. She said that, were she a defendant, she would not want her on her jury because she would not hesitate to impose the death penalty where guilt was proven. I am at a loss, given these written statements, to understand the majority's conclusion that these questionnaire responses "do not demonstrate an impossible bias towards the death penalty."[6]

¶ 5 I also cannot agree with the majority's conclusion that Juror D.B. was somehow rehabilitated by her answers in *voir dire.* She stated she could only give meaningful consideration to the punishment of life without parole if the death penalty was not an option. She explained this by asking, if a defendant

was imprisoned for life anyway, why not impose the death penalty. She stated she would have to consider all three alternatives, but agreed that she would probably automatically prefer death. She stated that, as a defendant, she would want a juror like herself because she would not want to spend her life in prison without the possibility of parole. This does not appear to be consideration of all three punishments, much less fair or meaningful consideration.

¶ 6 Juror A.S. twice wrote that the death penalty should be carried out on a person convicted of a capital crime. He felt that the death penalty rids society of the expense of housing, feeding and providing lifetime medical care for a prisoner. He noted that he was broadly in favor of capital punishment, that harsher punishment generally was required for the crime problem, that there should be no plea bargains, and that prisoners should serve all the time on an imposed sentence. He stated that, based on what he had heard, he could not be a fair and impartial juror. During voir dire, A.S. stated he could consider all three punishments but would lean more toward death or life without parole. He stated he could not consider life imprisonment for an intentional murder, because with good time credits that would not be a just punishment for such a severe crime. After hearing the suggestion that he might not be an appropriate juror for this case, A.S. said he felt he was an eligible juror. He stated that life imprisonment would obviously be the lesser of the three choices, down on his list, but that he could consider it. He stated that life without parole would be a better option if Eizember were convicted of intentional murder. A.S. was excused by a peremptory challenge and did not sit on Eizember's jury. However, he should have been excused for cause. Had the trial court properly excused A.S., Eizember would have had a peremptory challenge available to use on either juror J.S. or D.B.

4. *Hanson,* 72 P.3d at 48; *Humphreys v. State,* 1997 OK CR 59, 947 P.2d 565, 571.

5. *Rojem,* 130 P.3d at 295; *Jones,* 134 P.3d at 155; *Warner,* 29 P.3d at 572.

6. Majority Opinion at 225.

¶ 7 On his questionnaire, Juror J.S. stated that if guilty, the defendant would be on death row and eventually executed. J.S. stated that for that reason, were he the defendant, he would not want J.S. on his jury. J.S. also said he wanted to be on the jury so justice could be served. J.S. indicated he was willing to reschedule rotator cuff surgery—not a minor procedure—to ensure that he served. During voir dire J.S. said that he could consider all three punishments equally. His questionnaire responses were not discussed.

¶ 8 The majority suggests that, read in context, all three jurors' questionnaires and *voir dire* answers showed they could consider all three punishment options. The majority resists this Court's previous holdings that a juror must fairly consider each punishment.[7] Frankly, under these circumstances, whether the jurors could fairly consider or merely consider all three punishments does not matter. The evidence shows the responses met neither standard. Jurors A.S. and D.B. flatly stated they could not consider all three punishments. D.B. explicitly stated she favored the death penalty and felt life without parole was a waste of taxpayer money. A.S. stated that life imprisonment was not a just punishment for intentional murder. The majority admits, in D.B.'s case, that her "responses suggest she might have trouble considering all three options equally", but suggests that any consideration will do as long as the juror is not "irrevocably committed to any one punishment."[8] As applied to these jurors, this conclusion is absurd. While maintaining obvious biases, these jurors stated they could "consider" the punishment options. The majority's holding gives lip service to the constitutional requirement of an unbiased jury, while eviscerating its content. This Court has found reversible error, and remanded for resentencing, in capital cases where jurors exhibit similar biases and cannot consider all three punishments.[9] I would do the same here. I concur in affirming Eizember's convictions. I also concur in affirming his non-capital sentences, but I dissent to affirming Eizember's sentence of death. I am authorized to state that Judge Arlene Johnson joins in this opinion.

A. JOHNSON, J., Concurring in Part and Dissenting in Part.

¶ 1 I join Judge Chapel's opinion concurring in part and dissenting in part. I concur in affirming Eizember's convictions. I also concur in affirming his sentences on Counts I and Counts III through VI. Because jurors admittedly biased toward the imposition of death sat on his jury, however, I cannot affirm his sentence to death. I would remand this case for resentencing on Count II—First Degree Malice Murder.

LEWIS, Judge, concurs in results:

¶ 1 I concur in the result in this case affirming the convictions, judgment and sentences, however, I write to address the issue of the jury questionnaire. Based on the responses of the challenged jurors in this case, I agree with the legal analysis as presented by the majority opinion; however, I reserve judgment in other cases instead of agreeing with the statement that the pretrial questionnaire cannot trump the actual voir dire. I am of the opinion that there are some cases in which the jury questionnaire answers could indeed trump voir dire. I am not convinced that the jurors responses in this case standing alone provided cause for their disqualification. I therefore concur in the result reached in this case.

---

**7.** *Jones,* 134 P.3d at 155; *Hanson,* 72 P.3d at 48; *Warner,* 29 P.3d at 573.

**8.** Majority opinion at 226.

**9.** *Jones,* 134 P.3d at 155; *Hanson,* 72 P.3d at 49; *Warner,* 29 P.3d at 574; *Salazar,* 919 P.2d at 1128–29.